NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0628n.06
Filed: August 23, 2006

No. 05-6405

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

CHARLES ROLEN and VIRGINIA ROLEN,    )
    )
    Plaintiffs-Appellants,    )
    )
v.    )    On Appeal from the United States
    )    District Court for the Middle
HANSEN BEVERAGE COMPANY,    )    District of Tennessee
    )
    Defendant-Appellee.    )

Before:    BOGGS, Chief Judge; KEITH and SUTTON, Circuit Judges.

PER CURIAM. Plaintiffs-Appellants Charles and Virginia Rolen brought suit in Tennessee state court against Defendant-Appellee Hansen Beverage Company ("Hansen"), alleging that one of Hansen's juice products had caused Charles Rolen stomach problems for which he received treatment at a hospital. The Rolens asserted strict liability, negligence, and breach of warranties claims under Tennessee law. After removing the case to the United States District Court for the Middle District of Tennessee on diversity grounds, Hansen moved for summary judgment. The district court ruled that the testimony of the Rolens' expert witness, Dr. Mark Houston, as to causation did not meet the threshold requirements for admission of expert evidence under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and granted summary judgment to Hansen. The Rolens appeal the exclusion of the expert testimony and the corresponding grant of summary judgment. For the following reasons, we affirm those rulings by the district court.

I

Virginia Rolen purchased a package of Hansen's "Natural Red Berry Juice Blast" from a Costco on January 10, 2000. The cellophane-wrapped package contained individual boxes of juice. Charles Rolen ("Rolen") stated in a deposition that before he drank any of the juice, his son had consumed a box from the package, and his wife may have as well, and they had not become ill.

On January 20, 2000, Rolen, then seventy-one years old, consumed a box of Juice Blast over the course of an hour beginning at noon. Rolen thought it tasted like something might be wrong but not wrong enough for him to stop drinking it. Rolen had not had anything to eat that day before consuming the juice. He had had a cup of black coffee at 8 or 9 o'clock that morning. He did not remember what he and his wife and son had had for supper the previous night.

Rolen began to feel ill about 20-30 minutes after consuming the Juice Blast; he suffered from dizziness and dry heaves, and had his son call an ambulance. At the hospital, Rolen was put on medication and an IV. He stated in a deposition in July 2001 that he had had problems with his stomach since the incident in January 2000, and got nauseated and dizzy when he did not take the medicine he had been prescribed.

Although Rolen and his son took the carton from which Rolen had imbibed the Juice Blast to the hospital for testing on January 20, 2000, they were told that the hospital did not have facilities for testing it. The Rolens subsequently called other hospitals and centers to test the box (and eventually asked Dr. Houston, whose expert testimony is the subject of this appeal, to do so; Dr. Houston recommended a poison center at Vanderbilt), to no avail. As of at least October 2004, the

Rolens still possessed the carton that had contained the Juice Blast that Rolen had consumed, as well as other unopened cartons.

The Rolens filed suit in Tennessee state court against Hansen in August 2004, alleging violation of the Tennessee Products Liability Act of 1978, as amended, T.C.A. § 29-28-101 et seq.; negligence in designing and/or manufacturing the juice; and breach of warranties.

Hansen removed to the United States District Court for the Middle District of Tennessee on diversity grounds. Hansen moved for summary judgment in January 2005. To that motion Hansen attached an affidavit by Patrick Terrazas, Hansen's Quality Control Manager, who described standard procedures for producing and testing the Juice Blast drinks. Terrazas stated that Hansen had asked for the juice box in question, or one from the same package, for testing, that Hansen received a juice box and had it tested by an independent laboratory, and that the testing had identified "no organisms of public health concern." Hansen also attached to its summary judgment motion, inter alia, an affidavit from Dr. Donna Seger, a Tennessee medical doctor and poison center medical director retained by Hansen's counsel as an expert in this case, who opined that the Juice Blast did not cause Rolen's illness or food poisoning.

In response, the Rolens stated that "Mr. Rolen's complaints were caused by Staphylococcal food poisoning after ingesting the tainted juice." The Rolens cited Dr. Houston's deposition, which was submitted in full. Dr. Houston concluded in his deposition, which was conducted in June 2003, that Rolen "probably had a staphylococcal food poisoning from the ingestion of the Juice Blast or some other type of bacterial infection. But the most likely thing, based on his history, would be staphylococcal food poisoning."

Dr. Houston, an internal medicine doctor in Tennessee and Rolen's regular doctor since the late 1990s, has no specialization in toxicology. Dr. Houston did not see Rolen after the latter had consumed the Juice Blast until February 14, 2000, about three and a half weeks after Rolen drank the Juice Blast and received treatment at the hospital. Rolen complained to Dr. Houston of nausea, vomiting, abdominal pain, and dizziness after drinking the Juice Blast, although he stated that he had improved somewhat since his visit to the hospital on January 20. Dr. Houston conducted a physical examination that was "basically normal," with no abdominal tenderness or fever. Laboratory tests, such as stool cultures, taken during Rolen's visit to Dr. Houston turned up negative for any infection or "other biochemical abnormalities." Rolen had previously had an endoscopy, and Dr. Houston was evidently made aware of the results of that endoscopy before or at the time of Rolen's February 14 visit.[1] The upper GI endoscopy showed some gastritis, "which may have been related to his recent event with the Juice Blast," according to Dr. Houston, while the lower GI endoscopy showed diverticulosis, "pouchings in the colon that can sometimes cause abdominal pain, infections, and bleeding," which Dr. Houston ruled out as being related to Rolen's drinking the Juice Blast. During a follow-up visit on March 7, 2000, Dr. Houston conducted another physical examination, which again turned up nothing abnormal.

Dr. Houston explained his conclusion that Rolen had most likely suffered staphylococcal toxic poisoning resulting from ingestion of the Juice Blast by noting that staphylococcus is a bacteria

---

[1]It is unclear from the transcript whether Dr. Houston was given the actual results of the endoscopy or was told of the results by Rolen, although it is clear that at some point he saw hospital records.

that produces toxin, which itself is the cause of the GI symptoms. He stated that staphylococcal poisoning "usually occurs within a few hours after ingestion of food or drink, as opposed to having an incubation period, which is typical of most of the other type of bacterial gastroenteritis . . . ." The negative lab results were not significant to Dr. Houston because "typically, staphylococcal food poisoning is a toxin and you don't culture anything out usually unless you can actually measure the toxin from the food or drink from which the patient got sick, which I didn't have access to, so I couldn't do it."[2]

On cross-examination by defendant's counsel, Dr. Houston acknowledged that he had only heard about Hansen's Juice Blast insofar as Rolen stated that he had consumed some, and that he had no other information about the product or its manufacture. Dr. Houston estimated that the symptoms of staphylococcal food poisoning usually occur between one and twelve hours after exposure to the offending food source. He stated that Rolen's claims to have gotten sick within twenty minutes of ingesting the Juice Blast did not change his conclusion that Rolen's problems most likely resulted from staphylococcal food poisoning related to the Juice Blast, although he did not explain why such a rapid onset would not undermine his conclusion.

Dr. Houston said that he had not seen the results of any testing done on the same lot of juice product from which the carton in question had come, although he acknowledged that that was "very reasonable information to have." He suggested that he had tried to obtain samples (or test results

---

[2]Dr. Houston's statement that he did not have access to the box from which Rolen had consumed the Juice Blast, and so could not test it, seems inconsistent with Rolen's statement that, when he asked Dr. Houston to test the particular box, "Dr. Houston said he didn't have the facilities. He gave us the number for Vanderbilt. Said they had a poison control center there."

thereof; it is not clear), but that he "never got that." Dr. Houston stated that he would have liked to have had "the container that he actually drank to certify that there was toxin in that container," and also that he would have liked to check whether "there weren't problems with the production of other lots within the same batch." He stated that his conclusion that the Juice Blast had caused Rolen's stomach ailment nevertheless would not change even if an independent laboratory had tested Juice Blast from the same lot and found no toxin, "only because I think I would have to see the actual bottle that he ingested tested, if possible."

Asked by defense counsel whether, given that he did not know the ingredients in or manufacturing process of the Juice Blast, Dr. Houston was comfortable assigning blame for causation to the Juice Blast, Dr. Houston responded: "Well, the way you phrase it is, it may be a little harsh. But I think that based on the clinical history and the timing of the ingestion of the Juice Blast, it would seem a very reasonable assumption that he had a toxic effect from that drink, yeah." Dr. Houston acknowledged that when food poisoning occurs, it typically occurs in a number of people instead of one; that he was not aware of anyone else who had been poisoned by a Juice Blast; and that he had not read anything about it in the medical literature. Asked where the medical certainty entered his opinion regarding the Juice Blast as the cause of Rolen's illness, Dr. Houston stated: "It's based on Mr. Rolen's history to me in the office on that visit, which was that he had the acute onset of the symptoms related to the ingestion of the Juice Blast, and we couldn't identify any other good reasonable reason as to why he would have been sick."

The district court granted summary judgment in favor of Hansen in August 2005. The district court found that Dr. Houston's expert testimony did not satisfy the requirements of *Daubert*.

In so doing it noted that Dr. Houston never tested any Juice Blast product, was not aware of the manufacturing process of the drink, and could not explain why Rolen had become ill within twenty minutes of drinking the Juice Blast. Having determined that Dr. Houston's opinion evidence was inadmissible under *Daubert*, and that the Rolens cited no other expert testimony on proximate cause, the district court granted summary judgment for Hansen.

II

The Rolens argue that the district court improperly excluded Dr. Houston's testimony under *Daubert*, and erred in granting summary judgment in favor of Hansen on the ground that no admissible evidence existed to show causation.

We review de novo the district court's grant of summary judgment. Summary judgment is appropriate where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. "In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Dickenson v. Cardiac & Thoracic Surgery of Eastern Tennessee, P.C.*, 388 F.3d 976, 978 (6th Cir. 2004) (citations omitted).

The district court's decision to admit or exclude expert evidence is reviewed for abuse of discretion. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142, 152 (1999); s*ee also Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 248 (6th Cir. 2001) (This court reviews the district court's decision to exclude testimony of an expert witness for abuse of discretion "even when that decision results in the entry of summary judgment."). The abuse of discretion standard "applies as

No. 05-6405
Rolen v. Hansen Beverage Co.

much to the trial court's decisions about how to determine reliability [of the expert opinion

evidence] as to its ultimate conclusion." *Kumho*, 526 U.S. at 152-53.

The abuse of discretion standard is highly deferential. *Hardyman v. Norfolk & W. Ry. Co.*,

243 F.3d 255, 267 (6th Cir. 2001). "An abuse of discretion is found where the reviewing court is

firmly convinced that a mistake has been made." *Dickenson*, 388 F.3d at 980.

Federal Rule of Evidence 702 currently states[3]:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert*, the Supreme Court explained the "gatekeeping role" required of district courts under

the Rules, stating that "the trial judge must ensure that any and all scientific testimony or evidence

admitted is not only relevant, but reliable." 509 U.S. at 589, 597. "Pertinent evidence based on

scientifically valid principles will satisfy those demands." *Id*. at 597. The Court noted that

> in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation–*i.e.*, "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Id*. at 590.

---

[3]Federal Rule of Evidence 702 was amended in 2000 in response to *Daubert* and its progeny. FED. R. EVID. 702 advisory committee's notes.

The trial court, faced with a proffer of expert testimony, must determine at the outset whether the expert will testify to scientific knowledge that aids the factfinder. The Supreme Court stated that "[t]his entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. The Court emphasized that in making that assessment, "[m]any factors will bear on the inquiry." It provided a non-exclusive set of factors to guide the assessment: 1) whether the theory or technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and 4) the degree to which the theory or technique is accepted within the relevant scientific community. *Id.* at 593-94.

In *Kumho*, the Supreme Court made clear that the factors listed in *Daubert* need not be applied in each instance; the *Daubert* inquiry is flexible, and the specific factors set out in *Daubert* should be considered "where they are reasonable measures of the reliability of expert testimony." *Kumho*, 526 U.S. at 152. *See also id.* at 141-42, 151. The objective of the *Daubert* gatekeeping requirement, the *Kumho* Court stated, is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. The *Kumho* Court emphasized that "'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'" *Id.* at 157 (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). "A court

may conclude," the Supreme Court noted in *Joiner*, 522 U.S. at 146, "that there is simply too great an analytical gap between the data and the opinion proffered."

Expert opinions based upon nothing more than the logical fallacy of *post hoc ergo propter hoc* typically do not pass muster under *Daubert*. *See McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1242-43 (11th Cir. 2005); *Downs v. Perstorp Components, Inc.*, 26 F. App'x 472, 473-76 (6th Cir. 2002) (unpublished).

We are not firmly convinced that the district court made a mistake in excluding Dr. Houston's expert opinion testimony under *Daubert*. We therefore conclude that it did not abuse its discretion in so doing.

Dr. Houston's examination and testing of Rolen turned up nothing abnormal. Dr. Houston's review of information from an upper GI endoscopy, which had evidently been conducted by someone else, revealed some gastritis that Dr. Houston stated "may have been related to his recent event with the Juice Blast," but with no supporting reasoning or methodology. That analysis is a slender reed to grasp in attempting to show causation.

Dr. Houston stated that it would have been "very reasonable" to test Juice Blast from the same lot as that of the product Rolen had consumed, and subsequently reiterated that he would have liked to have made sure that "there weren't problems with the same batch." But he then stated that any test of juice product from the same lot that turned up negative–as the testing ordered by Hansen did–would not have changed his opinion, stating that he would "have to see the actual bottle that he ingested tested, if possible." Dr. Houston seemed to indicate that he asked Rolen for the carton from which Rolen drank, or another carton from the package, or at least information from the testing of

either, but did not obtain it. Rolen's account, however, is that he asked Dr. Houston to test the specific container in question but that Dr. Houston declined, instead referring Rolen elsewhere.

All of this indicates, as the district court suggested, that Dr. Houston's opinion as to causation was based less on a reasonable chain of evidence than on speculation solely from the absence of another obvious cause. That view is bolstered by the fact that Dr. Houston stated that the effects of staphylococcal food poisoning usually occur between one and twelve hours, whereas Rolen stated that he felt ill within about twenty minutes of drinking the Juice Blast, and Dr. Houston could not explain the difference. Furthermore, by his own admission Dr. Houston knew nothing about Hansen's Juice Blast, including how or with what it was made. Dr. Houston acknowledged that food poisoning typically affects more than one person, that he was unaware of another case of poisoning by a Juice Blast, and that he had not seen anything about it in the medical literature.

In light of the above discussion of Dr. Houston's deposition, we find that the district court was within its zone of discretion in determining that–to paraphrase *Joiner*–too great a gap existed between the available data and Dr. Houston's opinion as to causation. That opinion, which the doctor characterized at one point as "a very reasonable assumption that [Rolen] had a toxic effect from that drink . . . ." appears to have been based upon the logical fallacy *post hoc ergo propter hoc*.[4]

_____

[4]Although the Rolens have not raised the point directly, we note that this court has held that "[o]ne appropriate method for making a determination of causation for an individual instance of disease is known as 'differential diagnosis.'" *Hardyman*, 243 F.3d at 260. The *Hardyman* court defined differential diagnosis as "[t]he method by which a physician determines what disease process caused a patient's symptoms. The physician considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and

No. 05-6405
Rolen v. Hansen Beverage Co.

III

The Rolens acknowledge that the record is devoid of expert evidence on the issue of causation aside from that of Dr. Houston. We hold that the district court did not abuse its discretion in ruling that Dr. Houston's expert opinion did not meet the requirements of *Daubert*, and we affirm the district court's grant of summary judgment to Hansen on the ground that the Rolens are unable to show proximate cause. *See Downs*, 26 F. App'x at 477; *McCarley v. West Quality Food Serv*., 960 S.W.2d 585, 589 (Tenn. 1998) (holding that causation in negligent food contamination cases may be established by "either expert testimony or through a combination of both expert and lay testimony"). The judgment of the district court is therefore AFFIRMED.

---

a thorough case history." *Ibid*. (quoting Federal Judicial Center, *Reference Manual on Scientific Evidence* 214 (1994)). The sole indication that Dr. Houston employed anything like a differential diagnosis methodology in forming his opinion was his statement that his conclusion was "based upon Mr. Rolen's history to me in the office on that visit, which was that he had the acute onset of the symptoms related to the ingestion of the Juice Blast, and we couldn't identify any other good reasonable reason as to why he would have been sick." That statement does not show that Dr. Houston engaged in the kind of methodological rigor that characterizes acceptable differential diagnoses. *See Hardyman*, 243 F.3d at 260-67.