**NOT RECOMMENDED FOR PUBLICATION**
File Name: 07a0646n.06
Filed: September 4, 2007

**No. 06-1416**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| THOMAS A. KOLESAR, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| UNITED AGRI PRODUCTS, INC. and UAP | ) | MICHIGAN |
| DISTRIBUTION, INC., f/k/a GROWER SERVICE | ) | |
| CORP. (NEW YORK), | ) | |
| | ) | |
| Defendants-Appellees. | | |

Before: SILER, MOORE, and GILMAN, Circuit Judges.

**SILER, Circuit Judge**. Plaintiff Thomas A. Kolesar filed suit against United Agri Products, Inc. and UAP Distribution, Inc. (collectively, "Defendants" or "UAP") alleging that as a result of Defendants' negligence, Kolesar was exposed to a toxic chemical and thereafter contracted Reactive Airways Dysfunction Syndrome ("RADS"). The district court granted Defendants' motions in limine to exclude Kolesar's proffered expert testimony and also granted Defendants' summary judgment motion, reasoning that Kolesar could not support his claims that chemical exposure caused him permanent injury without qualified expert testimony. Kolesar appeals the district court's decision, asserting: (1) the district court abused its discretion by excluding the testimony of his treating physician, Dr. Taiwan Chen, because her opinions were based on a valid differential diagnosis; (2) even without the expert testimony, a jury question exists as to causation, and therefore

summary judgment is improper; and (3) the district court erroneously cited alternative grounds for summary judgment – Kolesar's contributory negligence and Wisconsin public policy – that usurped the jury's function in deciding disputed issues of fault allocation. For the reasons set forth below, we **AFFIRM**.

## BACKGROUND

Thomas A. Kolesar was employed as a hazardous materials tanker driver for Aero Bulk Carrier, Inc., a trucking company based in Grand Rapids, Michigan. On September 22, 2001, Kolesar delivered a shipment of Nemasol ® 42, or metam sodium, to Defendants' facility in Plainfield, Wisconsin. Metam sodium is a pesticide classified by the government as an Acute Toxicity Category III substance, where Category I is the most toxic ranking. Aero Bulk provided Kolesar with a Material Safety Data Sheet ("MSDS") describing the makeup of the chemical and health hazards associated with exposure to the chemical. The MSDS detailed the type of personal protective equipment ("PPE") that should be worn when transferring the product.

When Kolesar reached his destination, he was met by Brian Cullen, UAP Production Manager, who directed him to pull his truck onto the unloading pad. Cullen was wearing his PPE – rubber boots, rubber gloves, rubber apron, and safety goggles – while Kolesar remained in street clothes, although he initially did use chemical gloves. Kolesar admits that he knew metam sodium was a corrosive liquid and that the MSDS recommended PPE, but claims that he deferred to Cullen who allegedly told him, "Don't worry about [the PPE], it's no big deal." Cullen, on the other hand, maintains that he told Kolesar to wear the PPE and that Kolesar responded, "Oh, I don't need it." The two men proceeded to connect hoses linking Kolesar's truck to the receiving tank and then to

the storage silo. Kolesar activated the pump on the tanker truck, and Cullen opened the valve to the storage silo to begin the unloading process.

After completing the unloading tasks, Kolesar assumed that Cullen had "[done] his job" and had closed off the valve to the receiving tank to prevent the chemical from flushing back through the hose. Cullen had not, however, shut the valve. Therefore, when Kolesar disconnected the hose, the pressure from the product that was backflowing through the pump caused the hose to "come out in a circle, like a garden hose when it's running" and spray Kolesar's legs, hair, and arms with metam sodium.

Soon thereafter, Kolesar began to feel ill, stating that "every breath burned . . . . My nose started watering. My eyes started watering. I started getting really dizzy and nauseated . . . ." He began vomiting and called 911. An ambulance transported him to the local hospital where he was immediately given a decontamination shower. Hospital records indicate that Kolesar was experiencing bilateral expiratory wheezes, the skin on his face was irritated, and he was treated with an Albuterol nebulizer for his bronchospasm. He was observed overnight and was "well and asymptomatic" when he was discharged the next day.

Once back in his hometown of Pittsburgh, Pennsylvania, Kolesar met with pulmonologist Dr. Chen. Dr. Chen's first examination of Kolesar was on October 8, 2001, slightly more than two weeks after the chemical spill. During that visit, Kolesar explained to Dr. Chen that he had been suffering shortness of breath and wheezing since the exposure, and that he had no prior history of respiratory difficulty, other than smoker's cough. In fact, Kolesar had a long history of serious asthma that had required him to be hospitalized only six months before the chemical spill. Kolesar

also neglected to tell Dr. Chen that he was HIV positive. Based on Kolesar's clinical presentation, clinical examination, pulmonary function tests, x-rays, and what Dr. Chen knew of his medical history, she concluded that Kolesar's symptoms were caused by the metam sodium spill and diagnosed him with RADS.

Kolesar planned to present the expert testimony of Dr. Chen to support his claim at trial that chemical exposure to metam sodium caused him permanent injury. At the end of discovery, however, UAP filed a *Daubert* motion to exclude Dr. Chen's anticipated testimony. The district court granted UAP's motion and excluded Dr. Chen's conclusions as to causation, holding that her opinions would have been unreliable and not helpful to the jury under Rule 702 of the Federal Rules of Evidence. *Kolesar v. United Agri Prods, Inc.*, 412 F. Supp. 2d 686, 698 (W.D. Mich. 2006).

UAP was granted summary judgment. The district court reasoned that under Wisconsin law, because Kolesar did not present qualified expert testimony to prove causation, he could not carry his burden of proof for that element. Kolesar now contends that even if the testimony of Dr. Chen is excluded, summary judgment was not appropriate.

After the district court had completed its discussion of causation, thereby ending the suit, it proceeded to discuss an alternative basis for granting summary judgment. *Id.* It noted that under Wisconsin Statute Ann. § 895.045, which states that a plaintiff may not recover from defendants when he is more negligent than those defendants, Kolesar was more liable than UAP as a matter of law and, therefore, could not prevail against them. *Id.* at 698-99. In his appeal, Kolesar argues that by barring his recovery as a matter of law based on contributory negligence and Wisconsin public policy, the district court usurped the jury's function in deciding fault allocation.

No. 06-1416
Kolesar v. United Agri Prods

**STANDARD OF REVIEW**

We review the district court's decision to admit or exclude expert witness testimony for abuse of discretion. *General Electric Co. v. Joiner,* 522 U.S. 136, 143 (1997). This is a "highly deferential" standard of review, *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 267 (6th Cir. 2001), and "the appellate court will not reverse in such a case, unless the ruling is manifestly erroneous," *Joiner*, 522 U.S. at 142 (quoting *Spring Co. v. Edgar*, 99 U.S. 645, 658 (1879)). However, "[a] district court abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Brown v. Raymond Corp.*, 432 F.3d 640, 647 (6th Cir. 2005) (internal quotation marks omitted).

We review summary judgment *de novo*, construing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in the nonmovant's favor. *Turner v. City of Taylor*, 412 F.3d 629, 637 (6th Cir. 2005).

**DISCUSSION**

**A. Expert Testimony**

Kolesar maintains that under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and Rule 702 of the Federal Rules of Evidence, the testimony of Dr. Chen is admissible because "her opinions are both relevant and have a reliable foundation in the knowledge and experience of Dr. Chen's medical discipline." The district court disagreed, citing "defects in Dr. Chen's methodology used to reach [her] conclusions, the absence of supporting medical data and scientific literature, the absence of a valid basis for a differential diagnosis and the contrary scientific information and literature in the field." *Kolesar*, 412 F. Supp. 2d at 698.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. In *Daubert*, the Supreme Court described the "gatekeeping role" of trial judges and held that when considering a proffer of expert scientific testimony, Rule 702 requires that the judge "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The *Daubert* Court identified several factors to aid the reliability assessment including: (1) whether the theory or technique can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory or technique is generally accepted by the scientific community. *Id.* at 593-94.

The district court correctly identified these factors and analyzed the reliability of Dr. Chen's testimony pursuant to each factor. *Kolesar*, 412 F. Supp. 2d at 696-98. Kolesar's only explicit challenge to the district court's exclusion of Dr. Chen's testimony is his contention that Dr. Chen conducted a valid differential diagnosis.

A differential diagnosis is "[o]ne appropriate method for making a determination of causation for an individual instance of disease." *Hardyman*, 243 F.3d at 260. In *Hardyman*, the court defined "differential diagnosis" as

> [t]he method by which a physician determines what disease process caused a patient's symptoms. The physician considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history.

*Id.* (quoting Federal Judicial Center, *Reference Manual on Scientific Evidence* 214 (1994)).

Kolesar claims that Dr. Chen "made her differential diagnosis based on the acute onset of Kolesar's respiratory distress immediately following his exposure to metam sodium and the known

symptoms associated with metam sodium exposure," but never explains how this satisfies the definition of "differential diagnosis." Dr. Chen's diagnosis cannot be a differential diagnosis because she failed to consider or rule out alternative causes for Kolesar's illness, including his preexisting asthma and long history of cigarette smoking that he had failed to disclose to her.

Dr. Chen conceded that asthma can cause the same type of pulmonary obstruction that she observed in Kolesar and that the symptoms of RADS are similar to those of asthma. After learning of Kolesar's asthma, during her deposition on June 12, 2002, Dr. Chen concluded that the chemical exposure must have exacerbated his preexisting disease. She continued to assert that Kolesar suffered from RADS. Dr. Chen's conclusion was not the result of a careful study of Kolesar's prior medical records, however. Instead, she changed her diagnostic criteria for RADS so that her initial diagnosis could remain intact.[1] As the district court noted, her diagnosis lacks supporting medical data and scientific literature. In light of the methodological deficiencies in Dr. Chen's hypothesis, the district court did not abuse its discretion in excluding her expert testimony.

**B. Causation Without Expert Testimony**

Kolesar's next argument is that even if the district court correctly excluded expert testimony as to what caused Kolesar's injuries, summary judgment was not proper. Under Wisconsin law, "[e]xpert testimony is required to prove causation if the matter does not fall within the realm of ordinary experience and lay comprehension." *Menick v. City of Menasha*, 547 N.W.2d 778, 782

---

[1]Dr. Chen even provided two definitions of RADS, one that excludes persons suffering from prior serious pulmonary conditions (the medically accepted definition) and one that can include patients with pulmonary conditions (the definition she gave after learning that Kolesar has asthma). *Kolesar*, 412 F. Supp. 2d at 697.

(Wis. Ct. App. 1996); *see also* Weiss v. United Fire & Cas. Co., 541 N.W.2d 753, 758 (Wis. 1995) (stating that "[t]he lack of expert testimony in cases which are so complex or technical that a jury would be speculating without the assistance of expert testimony constitutes an insufficiency of proof"). Kolesar classifies his case as involving "a simple negligence claim" and emphasizes that a lay jury would be able to understand causation "based on [his] undisputed exposure to metam sodium, the known effects of such exposure, and his treatment and symptoms after he was exposed to metam sodium." Conversely, UAP asserts that this case involves an extraordinary and non-lay matter of causation because the metam sodium to which Kolesar was exposed was in liquid, not gaseous, form. Understanding the effect of the exposure would therefore require intricate knowledge of, among other things, the rate at which liquid metam sodium vaporizes into its more dangerous gaseous form.

Kolesar objects to UAP's argument, contending that elsewhere in its brief UAP admitted that the spilled metam sodium was dangerous without the need for expert testimony to establish as much. In its contributory negligence discussion, UAP essentially argues that because metam sodium is a known hazardous chemical, Kolesar should have known better than to act as he did. However, whether metam sodium is dangerous is not the issue requiring expert testimony in this case. Expert testimony is necessary to explain how Kolesar's exposure to an admittedly corrosive, although nonvolatile, liquid metam sodium resulted in a significant exposure to an inhalable gas or vapor such that a juror could conclude Kolesar's post-incident pulmonary symptoms were caused by the spill, rather than by his preexisting asthma. Without proof of causation, Kolesar cannot succeed on his

negligence claim. *See Menick*, 547 N.W.2d at 783. Therefore, the district court correctly granted summary judgment.

## C. Contributory Negligence and Wisconsin Public Policy

Kolesar's final argument is that the district court usurped the jury's role in fault allocation when it stated that Kolesar is more liable than Defendants as a matter of law and that Wisconsin public policy supports barring Kolesar's recovery. We need not reach this argument because regardless of whether the district court erred on this point, summary judgment was still proper.

**AFFIRMED**.