EDMUND A. SARGUS, JR., CHIEF UNITED STATES DISTRICT JUDGE
This case is before the Court on two matters:
(1) Defendant's Motion to Exclude the Opinions and Testimony of Specific Causation Expert Dr. Robert Bahnson (ECF No. 4657), Plaintiff's Memorandum in Opposition to Defendant's Motion Regarding Dr. Bahnson (ECF No. 4685), and Defendant's Reply in Support of its Motion Regarding Dr. Bahnson (ECF No. 4700), and
(2) Plaintiff's Motion to Partially Exclude the Opinions and Testimony of Defense Specific Causation Rebuttal Expert Dr. Tony Luongo (ECF No. 4649), Defendant's Memorandum in Opposition to Plaintiff's Motion Regarding Dr. Luongo (ECF No. 4683), and Plaintiff's Reply in Support of his Motion Regarding Dr. Luongo (ECF No. 4696).
For the reasons set forth below, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion Regarding Dr. Bahnson, and GRANTS IN PART AND DENIES AS MOOT IN PART Plaintiffs' Motion Regarding Dr. Luongo.
I.
Plaintiff Kenneth Vigneron, Sr.'s trial is scheduled for November 14, 2016, as the first non-bellwether trial of the over 3500 cases filed against Defendant E. I. du Pont de Nemours and Company's ("DuPont") that make up this multidistrict litigation ("MDL"). The Judicial Panel on Multidistrict Litigation describes the cases in its Transfer Order as follows:
All the actions are personal injury or wrongful death actions arising out of plaintiffs' alleged ingestion of drinking water contaminated with a chemical, C-8 (also known as perfluorooctoanoic acid (PFOA) or ammonium perfluorooctanoate (APFO) ), discharged from DuPont's Washington Works Plant near Parkersburg, West Virginia. All of the plaintiffs in this litigation allege that they suffer or suffered from one or more of six diseases identified as potentially linked ("Linked Diseases") to C-8 exposure by a study conducted as part of a 2005 settlement ["Leach Settlement Agreement" or "Contract"] between DuPont and a class of approximately 80,000 persons ("Leach Class") residing in six water districts allegedly contaminated by C-8 from the Washington Works Plant. See Leach v. E. I. Du Pont de Nemours & Co. , No. 01-C-608 (W. Va. Cir. Ct. [ (Wood County Aug. 31, 2001), ("Leach Case") ].
(Transfer Order at 1, ECF No. 1.) DuPont utilized C-8 as a manufacturing aid in the production of Teflon™.
A. The Leach Case / This MDL
As indicated by the Judicial Panel in its Transfer Order, the cases that make up this MDL are a subset of cases that originated in the Leach Case. The Leach Case was brought by a group of individuals who alleged a variety of claims under West Virginia common law tort theories, as a result of alleged drinking water contamination. In the Leach Settlement Agreement, the parties fashioned a unique procedure to determine whether the Leach Class would be permitted to file actions against DuPont based on any of the human diseases they believed had been caused by their exposure to the C-8 discharged from DuPont's Washington Works plant. (Leach Settlement Agreement ("S.A."), ECF No. 820-8.)
*656 The procedure required DuPont and the representatives of the Leach Class to jointly select three completely independent, mutually-agreeable, appropriately credentialed, epidemiologists ("Science Panel") to study whether there is a connection between C-8 and human disease among the Leach Class. (S.A. §§ 12.2.1, 12.2.2.) Pursuant to the agreed procedure the parties set forth in the Leach Settlement Agreement, the Science Panel established protocols and studied C-8's connection to numerous human diseases among the Leach Class. (S.A. §§ 12.2.2, 12.2.3.) The Science Panel examined health data and blood samples collected through the C-8 Health Project from approximately 69,000 potential members of the Leach Class. (http://www.c8sciencepanel.org/c8health.html) ("The Science Panel, as part of the Community Study, received the anonymised and non-identifiable health data collected by Brookmar [in the C-8 Health Project] to examine and analyze as part of its work."). DuPont paid the cost of the study which was more than $20 million dollars. (S.A. § 9.1.)
The Leach Settlement Agreement provided that the conclusions of the Science Panel's study would be issued in either a "Probable Link Finding" or a "No Probable Link Finding" for each human disease the Panel studied. (S.A. § 12.2.3.) "[T]he Probable Link reports [are] presented in detail in scientific articles (follow link [on the C-8 Science Panel website to the] Study Publications." (http://www.c8sciencepanel.org/studv.html.) The Leach Settlement Agreement defines "Probable Link" as follows:
"Probable Link" shall mean that based upon the weight of the available scientific evidence, it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members.
(S.A. § 1.49.)
The Probable Link and No Probable Link Findings apply to the members of the Leach Class, which is defined as a group of individuals who, "for the period of at least one year," has "consumed drinking water containing .05 ppb or greater of C-8 attributable to releases from [DuPont's] Washington Works" plant from any of the "six specified Public Water Districts" or any of the Covered Private Sources named in the Leach Settlement Agreement. (S.A. § 2.1.1.)
Until the Science Panel reached its conclusions and issued its Findings, the claims of the Leach Class members were stayed for the seven years in which the Science Panel engaged in its work. In 2011 and 2012 the Science Panel issued Probable Link Findings for the Linked Diseases, which include testicular cancer, and No Probable Link Findings for over forty human diseases.
The benefit the Leach Class received for agreeing to this seven year stay in their litigation was DuPont's agreement not to contest the issue of general causation for any Linked Disease. The Contract in relevant part provides:
Upon delivery of any Probable Link Finding to the Administrator, Defendant agrees that, in any personal injury or wrongful death action brought by, on behalf of, or otherwise pertaining to a Class Member, Defendant will not contest the issue of General Causation between C-8 and any Human Disease(s) as to which a Probable Link Finding has been delivered , but reserves the right to contest Specific Causation and damages as to any individual Class Member or plaintiff and to assert any other defenses not barred by this Agreement.
*657 (S.A. § 3.3) ("conditional release and covenant not to sue" section).
The parties defined general and specific causation as follows:
"General Causation" shall mean that it is probable that exposure to C-8 is capable of causing a particular Human Disease.
....
"Specific Causation" shall mean that it is probable that exposure to C-8 caused a particular Human Disease in a specific individual.
(S.A. §§ 1.25, 1.60.)
In other words, the benefit the Leach Class Members received in return for waiting for the Science Panel to determine that it was more likely than not there is a link between their exposure to C-8 and their Linked Disease (Probable Link Finding) is that DuPont agreed not to contest whether C-8 is capable of causing their Linked Disease (general causation). DuPont retained the right to contest that, although it is probable that exposure to C-8 is capable of causing the Class Member's Linked Disease (not contesting general causation), it is not probable that exposure to C-8 caused the Linked Disease in that particular Class Member (contesting specific causation).
As for the benefit to DuPont for funding the Science Panel's work and agreeing not to contest whether general causation was established, it received a seven year reprieve from defending any litigation related to its discharge of C-8 into the drinking water of approximately 80,000 people, nearly 70,000 of whom participated in the C-8 Health Project. DuPont also received the benefit of the No Probable Link Findings. This meant that tens of thousands of potential lawsuits were forever prohibited because, once a No Probable Link Finding issued, DuPont was "forever discharge[d] from any and all claims, losses, damages, attorneys' fees, costs, and expenses, whether asserted or not, accrued or not, known or unknown, for personal injury and wrongful death, including but not limited to any claims for injunctive relief and special, general and punitive and any other damages whatsoever associated with such claims [for which a No Probable Link Finding issued], that: (a) relate to exposure to C-8 of Class Members from any and all pathways including, but not limited to, air, water and soil; (b) are based on the same factual predicate as raised in the Lawsuit ...." Id. § 3.3.
Because the Science Panel delivered Probable Link Findings for the six Linked Diseases, the Leach Settlement Agreement permitted the individual Class Members to pursue their claims "for personal injury and wrongful death, including but not limited to any claims for injunctive relief and special, general and punitive and any other damages whatsoever associated with such claims, that ... relate to exposure to C-8 of Class Members." (S.A. § 3.3.) The individuals who suffered from one or more of the Linked Diseases began to file cases in West Virginia and Ohio. DuPont then moved the United States Judicial Panel on Multidistrict Litigation for centralization of these Leach Class Members' individual personal injury and wrongful death actions pursuant to 28 U.S.C. § 1407. The Judicial Panel granted DuPont's request and on April 9, 2013, it transferred this MDL to this Court.
From April 2013 through February 2015, the parties engaged in discovery and selection of discovery pool plaintiffs from which the bellwether cases would be selected. (Case Management Order No. ("CMO") 2, ECF No. 30); (CMO 3, ECF No. 31); (CMO 4, ECF No. 68); (CMO 5, ECF No. 128); (CMO 6, ECF No. 194); (CMO 7, ECF No. 602); (CMO 9, ECF No. 3549); (Discovery Order No. ("DO") 1, ECF No. 213); (DO 2, ECF No. 223); (DO 3, ECF No. 237); (DO 4, ECF No. 247);
*658 (DO 5, ECF No. 251); (DO 6, ECF No. 264); (DO 7, ECF No. 270). Through a negotiated process, the parties chose, and this Court approved, six plaintiffs whose cases would serve as bellwether trials - three plaintiffs' choices and three chosen by DuPont.
To prevail on their personal injury claims, each of the plaintiffs must prove (1) that they are members of the Leach Class, (2) that they suffer or suffered from a Linked Disease, and (3) that C-8 was the specific cause of their Linked Disease, i.e. , expert testimony that C-8 was a substantial contributing factor to his or her development of the Linked Disease. Because DuPont has contractually agreed not to contest general causation, the plaintiffs are not required to prove that C-8 is capable of causing their Linked Disease.
The parties settled three of the bellwether trials and one was withdrawn as a bellwether by the plaintiffs. The remaining two bellwether cases went to trial. The first was chosen by DuPont; a kidney cancer case brought by Carla Marie Bartlett (Case No. 2:13-cv-170, "Bartlett ECF."), which resulted in a $1.6 million jury verdict in favor of Mrs. Bartlett. The plaintiffs chose the second case, which was filed by David Freeman, who suffered from testicular cancer (Case No. 2:13-1103, "Freeman ECF."). His case ended in a $5.1 million jury verdict award in his favor on the negligence claim and $500,000 on the claim for punitive damages. Robert Bahnson, M.D., F.A.C.S. was utilized as the specific causation expert in both of those cases.
The Court and the parties are now in the process of preparing for trial of the non-bellwether cases, scheduling 40 that will be tried in the next year. (CMO 17, ECF No. 4459.) The first non-bellwether trial is scheduled to begin November 14, 2016, and is a testicular cancer case brought by Kenneth Vigneron, Sr. (Case No. 2:13-cv-136). (CMO 18, ECF No. 4588.)
B. Mr. Vigneron's Case
Mr. Vigneron consumed drinking water supplied by the Little Hocking Water Association ("LHWA") from 1981 through 1987, and then again from 1990 to the present (Expert Report of David L. MacIntosh[1] at 6-7, ECF No. 4672-2.) It is uncontroverted that LHWA is one of the six water districts contaminated by the C-8 released from DuPont's Washington Works Plant. During the period that Mr. Vigneron consumed water from LHWA prior to the finalization of the Leach Settlement Agreement in 2005, the concentration of C-8 in the LHWA water ranged from 1.0-5.8 ppb, which is approximately 20 to 116 times higher than the 0.05 ppb C-8 concentration exposure threshold established under the parties' Contract for Leach Class Member status. Id. at 7. By 2005, Mr. Vigneron had been exposed to these elevated C-8 drinking water concentration levels for over twenty times longer than the one year durational requirement for Leach Class membership pursuant to the parties' Contract.
In 1997, Mr. Vigneron took his son to a routine doctor visit and read a chart on self-examinations that was in the exam room. (June 28, 2016 Dep. Tr. of Kenneth Vigneron, Sr., June 28, 2016 at 83-84, ECF No. 4641-1.) A few weeks after reading the self-examination chart, Mr. Vigneron conducted two self-examination and found in both that his left testicle felt hard. Id. at 84. Mr. Vigneron then sought medical treatment.
On April 23, 1997, Mr. Vigneron was admitted to surgery for a left radical orchiectomy to remove his left testicle. (Expert Rep. of Robert Bahnson, M.D., *659 F.A.C.S. at 4, ECF No. 4640-2.) After the surgical procedure, the pathology report revealed a 2.7 × 2 × 2.3 centimeter embryonal cell carcinoma, i.e. , testicular cancer. Id. A CAT scan following the orchiectomy demonstrated that the tumor had metastasized to the retroperitoneal lymph nodes. Id. In response, Mr. Vigneron consulted with two oncologists, and was ultimately advised to undergo intravenous chemotherapy, and did, in fact, undergo three full cycles of chemotherapy with cisdiamminedichlorplatinum II (cDDP), etoposide and belomycin. Id. Mr. Vigneron underwent approximately ten years of cancer surveillance. (Luongo Rep. at 5, ECF No. 4639-6.) Mr. Vigneron has not had a recurrence of cancer.
To meet his burden of showing that his ingestion of C-8 caused his testicular cancer, Mr. Vigneron has proffered the expert opinion of Dr. Bahnson. (Bahnson Rep., ECF No. 4640-2; Aug. 26, 2016 Bahnson Dep., ECF No. 4641-5). Dr. Bahnson is a licensed medical doctor, a surgeon, and a Board Certified urologist, a field of medical specialization in diseases of the urinary tract and the male reproductive system, who has been practicing medicine for over thirty years. Dr. Bahnson is a Professor in the Department of Urology at The Ohio State University Wexner Medical Center, which is part of The Ohio State University Comprehensive Cancer Center. Until June 30, 2016, he practiced at the Arthur G. James Cancer Hospital and Richard J. Solove Research Institute, where he was a department chair and a previous Chief of Staff. He has authored or co-authored over one-hundred peer-reviewed articles, reviews, and book chapters, many of which focus on different aspects of urologic oncology, which includes cancer of the prostate, bladder, kidney, and testicular cancer.
DuPont offers Tony Luongo, B.Sc., M.D., F.R.C.S.C., F.A.C.S., as a specific causation rebuttal expert. Dr. Luongo finished his medical training in 2006 and is an Associate Professor in the Department of Urology at Tufts University School of Medicine and staff urologist at Tufts Medical Center in Boston, Massachusetts. (Luongo Expert Rep., ECF No. 4639-6; Aug. 30, 2016 Luongo Dep. 4641-6) The majority of Dr. Luongo's clinical practice involves the treatment and management of urologic cancers, including the medical and surgical treatment of testicular cancer. He is the author or coauthor of over 50 articles, abstracts, reviews, editorials, and book chapters, mostly in the area of urologic cancers.
II.
In Daubert v. Merrell Dow Pharmaceuticals, Incorporated , 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court held that the Federal Rules of Evidence, in particular Rules 702 and 104(a), govern the admission of expert witness testimony and require that the trial judge "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert , 509 U.S. at 589, 113 S.Ct. 2786. Because Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence,' " expert testimony "which does not relate to any issue in the case is not relevant and ergo, nonhelpful." Daubert , 509 U.S. at 590-90, 113 S.Ct. 2786. "In other words, there must be a 'fit' between the proposed testimony and the question(s) presented by the case at bar." Id. at 591, 113 S.Ct. 2786.
The burden is on the party proffering the expert report to demonstrate by a preponderance of proof that the opinions of their experts are admissible. Nelson v. Term. Gas Pipeline Co. , 243 F.3d 244, 251 (6th Cir. 2001). A district court exercises its responsibility in acting as the "gatekeeper"
*660 for expert testimony, Daubert , 509 U.S. at 588, 113 S.Ct. 2786 ; Kumho Tire Co. v. Carmichael , 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). This role, however, is not intended to supplant the adversary system or the role of the jury. In re Scrap Metal Antitrust Litig. , 527 F.3d 517, 531-32 (6th Cir. 2008). Arguments regarding the weight to be given any testimony or opinions of an expert witness are properly left to the jury. Id. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (quoting Daubert , 509 U.S. at 596, 113 S.Ct. 2786 ).
To determine whether expert testimony is "reliable," the court's role, and the offering party's responsibility, "is to make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael , 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Generally, the expert's opinions must reflect "scientific knowledge ... derived by the scientific method," representing "good science." Daubert , 509 U.S. at 590, 593, 113 S.Ct. 2786. The test of reliability is, however, a "flexible" one. Kumho Tire Co. , 526 U.S. at 140, 119 S.Ct. 1167. Any doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility. Fed. R. Evid. 702 Advisory Committee's Notes ("[A] review of the case law... shows that rejection of the expert testimony is the exception rather than the rule."); Jahn v. Equine Services, PSC , 233 F.3d 382, 388 (6th Cir. 2000) (stating that in Daubert "[t]he Court explained that Rule 702 displays a liberal thrust with the general approach of relaxing the traditional barriers to opinion testimony") (internal quotations omitted).
III.
DuPont moves for exclusion of the following opinions offered by Dr. Bahnson in his expert report:
Mr. Vigneron's exposure to C8 was a substantial contributing factor to his development of testicular cancer, his resulting surgery and chemotherapy, his resulting follow-up care, and related sequelae.
....
As a result of his testicular cancer, there is an increased statistical likelihood that Mr. Vigneron will develop testicular cancer in his remaining testicle, other cancers, and additionally, he will continue to need physical examinations, imaging studies and blood tests throughout his life to ensure that his cancer remains in remission.
As a result of his exposure to C8, there is a further increased statistical likelihood of recurrence of his testicular cancer in his remaining right testicle as well as development of each and every other disease for which the C8 Science Panel found a Probable Link.
...
As a result of his chemotherapy with cDDP (cis-platin), Mr. Vigneron has developed peripheral neuropathy.
(Bahnson Expert Rep. at 3-4, 7, ECF No. 4640-2.)
DuPont maintains that Dr. Bahnson's proffered expert opinions are inadmissible because Dr. Bahnson (A) failed to appropriately utilize a differential diagnosis, (B) sets forth unreliable opinions regarding age and causation, (C) failed to use valid methodology to support his opinion on a secondary illness, and (D) his increased risk opinions are inadmissible because they are litigation-driven.
*661 A. Differential Diagnosis
Dr. Bahnson utilized a differential diagnosis to reach his specific causation opinion. As to this scientific technique, the United States Court of Appeals for the Sixth Circuit explains:
This circuit has recognized differential diagnosis as an "appropriate method for making a determination of causation for an individual instance of disease." Hardyman v. Norfolk & W. Ry. Co. , 243 F.3d 255, 260 (6th Cir. 2001) ; see also Best [v. Lowe's Home Centers, Inc. ], 563 F.3d [171,] 178 [ (6th Cir. 2009) ] (stating that a causation opinion based upon a reliable differential diagnosis may satisfy the requirements of Rule 702 ). Differential diagnosis is "a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." Hardyman , 243 F.3d at 260 (internal quotation marks omitted). As we explained in Best , a physician who applies differential diagnosis to determine causation "considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history." 563 F.3d at 178 (internal quotation marks omitted).
Pluck v. BP Oil Pipeline Co. , 640 F.3d 671, 678 (6fh Cir. 2011).
Calling something a 'differential diagnosis' or 'differential etiology' does not by itself answer the reliability question but prompts three more:
(1) Did the expert make an accurate diagnosis of the nature of the disease? (2) Did the expert reliably rule in the possible causes of it? (3) Did the expert reliably rule out the rejected causes? If the court answers "no" to any of these questions, the court must exclude the ultimate conclusion reached.
Id. (quoting Tamraz v. Lincoln Elec. Co. , 620 F.3d 665, 674 (6th Cir. 2010) ).
" 'The core of differential diagnosis is a requirement that experts at least consider alternative causes.' " Best , 563 F.3d at 179 (quoting In re Paoli Railroad Yard PCB Lit. , 35 F.3d 717, 759 (3d Cir. 1994) ). Yet, "doctors need not rule out every conceivable cause in order for their differential-diagnosis-based opinions to be admissible." Id. at 181. " 'The fact that several possible causes might remain uneliminated ... only goes to the accuracy of the conclusion, not to the soundness of the methodology.' " Jahn , 233 F.3d at 390 (quoting Ambrosini v. Labarraque , 101 F.3d 129, 140 (D.C. Cir. 1996) ).
DuPont contends that Dr. Bahnson's opinion and testimony should be excluded because he failed to (1) consider or "rule out" the likelihood that something unknown caused Mr. Vigneron's testicular cancer, and/or (2) "rule in" or "rule out" several relevant risk factors for testicular cancer. (Def.'s Mot. at 8, 13.)
1. Unknown Cause
DuPont posits that
Dr. Bahnson failed to properly consider [in] his differential etiology the likelihood that something unknown caused Plaintiff's testicular cancer. Despite the fact that Dr. Bahnson repeatedly conceded in prior C-8 litigation that something unknown causes the great majority of testicular cancers, he did not even acknowledge in his expert report the possibility that Plaintiff's testicular cancer could have been caused by something unknown, much less "rule out" unknown causes from his purported differential etiology.
(Def.'s Mot. at 1.)
DuPont cites to multiple instances in Dr. Bahnson's deposition testimony in the instant *662 action and his trial testimony as the causation expert in the Freeman trial of Dr. Bahnson agreeing with the proposition that unknown causes account for a majority of testicular cancer cases. Id. at 6-7. In his deposition testimony, Dr. Bahnson expressly states numerous times that he did consider the possibility that Mr. Vigneron's testicular cancer could be of unknown origin, for example:
Q. Okay. You've previously agreed with me, have you not, that there are testicular cancer cases in which you're not able to determine any cause for the testicular cancer ?
A. I agreed to that, yes.
Q. Okay. And so it's fair to say that testicular cancer can in fact occur without any known cause?
A. .... I can agree to that.
Q. Okay. So despite that fact, Doctor, in Mr. Vigneron's case you did not take into consideration the fact that there was an unknown cause for his testicular cancer.
A. No, because -- going back again to your predecessor, Mr. Mace, and the trial testimony that was given in cases where he said, we can agree that in the vast majority of cases we don't know what causes the cancer, and I agreed with him. I said that I agree. So anytime someone comes to you with a cancer, that is always clearly one of the things that you're thinking about, is that this is a spontaneous cancer for which there is no cause.
(Bahnson Dep. Tr. at 109-110.)[2]
Even though DuPont cites to this testimony and numerous other examples of Dr. Bahnson testifying that the majority of testicular cases have no known cause and that he, in his thirty years of treating cancer patients with testicular cancer has always considered this statistic, DuPont first contends that (a) Dr. Bahnson's deposition testimony and his prior trial testimony on this subject are insufficient to "save" his specific causation opinions because the opinions were not timely disclosed in his written expert report submitted in the Vigneron case. (Def.'s Reply at 6.) DuPont argues that Dr. Bahnson was required to state this position regarding unknown cause somewhere in his written expert opinion report, as he did in his expert report in Freeman , or to list in the written report "unknown cause" with the other known risk factors for Mr. Vigneron's cancer, and then to rule it out. DuPont additionally argues that (b) even if Dr. Bahnson's deposition testimony and prior trial testimony may supplement his expert report, his testimony should still be excluded because Dr. Bahnson's bases for ruling out unknown causation are improper.
a. Disclosure Timeliness
DuPont relies upon Rule 26 of the Federal Rules of Civil Procedure, stating that the Rule "requires that an expert report contain 'a complete statement of all opinions the witness will express and the basis and reasons for them.' " (DuPont's Mot. at 10) (citing Fed. R. Civ. P. 26(a)(2)(B)(i) ) (emphasis added by DuPont). Mr. Vigneron, however, correctly points out that Rule 26"contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." Thompson v. Doane Pet Care Co. , 470 F.3d 1201, 1203 (6th Cir. 2006). As a sister district court has explained:
There are several purposes behind the disclosure requirements of Rule 26(a)(2). An obvious purpose is to prevent "surprise[s]
*663 as to the scope of testimony." Fielden v. CSX Transp., Inc. , 482 F.3d 866, 871 (6th Cir. 2007). This prevention of surprises during later stages of litigation also serves to conserve judicial resources. Nan Ya Plastics Corp. v. Global Polymers, LLC , 2005 WL 5988669 at *2 (W.D. Ky.2005)citing Sylla-Sawdon v. Uniroyal Goodrich Tire Co. , 47 F.3d 277, 284 (8th Cir. 1995). Another purpose was revealed by the Advisory Committee, which stated: "Effective cross-examination of an expert witness requires advance preparation. The lawyer even with the help of his own experts frequently cannot anticipate the particular approach his adversary's expert will take or the data on which he will base his judgment on the stand." Advisory Committee on Federal Rules, Notes to 1970 Amendment to Rule 26(b)(4) .
Anderson v. Ridge Tool Co. , CIV.A. 06-116-HRW, 2008 WL 3849923, at *2 (E.D. Ky. Aug. 14, 2008) ; id. *4 (finding that "[d]espite the protestations of the Defendant to the contrary, none of the purposes of Rule 26(a)(2) have been contravened by [the expert witness'] report in the present case.... [who has offered] sufficient information for the Defense to prepare a very effective cross-examination of [the expert] and his methodology.").
Here, the Court finds that none of the purposes of Rule 26 have been contravened by Dr. Bahnson's testimony. DuPont, of course, does not claim to be surprised by the scope of Dr. Bahnson's testimony and certainly anticipated the particular approach Dr. Bahnson utilized and the data on which he bases his judgment. DuPont's counsel's well informed cross examination during deposition of Dr. Bahnson for the Vigneron trial testifies to such. DuPont's counsel likely possessed far more information on the "particular approach" Dr. Bahnson took and the "data on which he will base his judgment on the stand" than is usual for opposing counsel. This is because a distinctive feature of this case is that Dr. Bahnson has appeared in the last two trials held in this MDL, and the last one Freeman , was a testicular cancer case. DuPont has deposed Dr. Bahnson several times about his knowledge and experience with testicular cancer and has cross examined him on the same at the Freeman trial.
Indeed, in Freeman, DuPont raised the exact issue under consideration here, i.e. , whether Dr. Bahnson had appropriately accounted for the possibility that the cause of Mr. Freeman's testicular cancer was of unknown origin. DuPont filed a Daubert motion on this very issue , arguing that "Dr. Bahnson's methodology is fatally flawed, and his specific causation opinion should be excluded" because he "completely failed to consider that Mr. Freeman's testicular cancer was more likely than not the result of unknown causes-or idiopathic-as it is in the vast majority of men who get it." (DuPont's Mot. to Exclude the Testimony of Trial Plaintiff David Freeman's Specific Causation Expert, Dr. Robert Bahnson at 7, ECF No. 4314); (DuPont's Reply in Support of its Mot. to Exclude Plaintiff Freeman's Specific Causation Expert, Dr. Robert Bahnson at 13) (asserting that Dr. Bahnson "simply chose to ignore the idiopathic issue completely in his expert report").
This Court thoroughly analyzed the issue in Evidentiary Motions Order No. ("EMO") 4, which the Court will not repeat here except to say that it found that Dr. Bahnson had appropriately considered whether Mr. Freeman's testicular cancer was the result of unknown causes. (EMO 4, ECF No. 4518.) And, while risk factors for testicular cancer may impact an expert's analysis depending on the patient, the data that shows that the cause of a *664 majority of testicular cancers is unknown has not changed since the Freeman trial.
DuPont attempts to distinguish the Court's holding on this issue set forth in EMO 4, stating that, "[i]n the Freeman case, the Court found that Dr. Bahnson had properly considered unknown causation" but it did so because it recognized that Dr. Bahnson has stated in this report that "there is no generally accepted cause of testicular cancer" and, contrarily, in Mr. Vigneron's case "Dr. Bahnson's report contains no such concession." (Def.'s Mot. at 10, n.5) (citing EMO No. 4 at 15, ECF No. 4518.) While this issue would have been put to rest if Dr. Bahnson had been clearer in his written expert report on this issue, as explained above, Dr. Bahnson's deposition testimony appropriately supplements, elaborates upon, and explains his positions set out in his written expert report.
b. Ruling Out Unknown Causation
DuPont asserts that even if Dr. Bahnson's deposition and prior testimony supplements and explains his positions in his expert report, Dr. Bahnson's testimony should still be excluded because he improperly ruled out unknown causation as cause for Mr. Vigneron's cancer. As to the methodology upon which Dr. Bahnson relied to rule out unknown causation, the parties both highlight the following testimony:
Q. [To Dr. Bahnson by DuPont's counsel]: Okay. All right. Doctor, going back -- going back to the issue of unknown causation for 22 testicular cancer, what I need to know from you is, how was it possible for you to determine in Mr. Vigneron's case that it was C8 exposure as opposed to some unknown thing that was a substantial contributing factor in causing his cancer ?
A. To save time, I would just say I'd recapitulate all the arguments that I've given you earlier today.
Q. All right. I'm going to need a little bit more than that, Doctor. So specifically, you know, we know what risk factors you looked at to rule in and then rule out But how is it that you can tell this jury that it was C8 that was a substantial contributing factor in causing Mr. Vigneron's testicular cancer as opposed to some other unknown thing?
A. Okay. So here's a man that got a testicular cancer later in life than most men who get testicular cancer. This is a man who didn't have any of what I would call the known and substantiated risk factors for testis cancer. We have a substantial and well-conducted epidemiologic study that makes it clear that exposure to levels of C8 in water and certain serum levels are associated with and are causative for kidney cancer and testis cancer. So while we've agreed before in the substance of this discussion and interrogation that many of the testicular cancers, if not most, there is no known cause, in this situation there is a cause. The cause is his exposure to C8. And we know that he had a huge exposure to C8 because of the serum levels that were reported in him when he was tested. So that's what I'm going to tell the jury is, is that this poor man unwittingly ingested all the water that was contaminated with your client's poison, and as a consequence he developed a testis cancer. And that's my opinion, and I'll work very hard to convince them that that's the case.[3]
*665 Q. I understand that and I appreciate that. The epidemiological study that you referenced in your response, that's your epidemiological study?
A. No. That's the original study that we've talked about I think twice or possibly three times already today.
....
Q. Do you agree with what your - what Counsel just said in terms of it was the C8 Health Project [to which you refer]?
A. Yes.
(Bahnson Dep. at 170-73.) DuPont also relies upon what it characterizes as Dr. Bahnson's reliance upon "the alleged magnitude of Mr. Vigneron's actual dose of C-8 and/or the quality of the Science's Panel's work," his statements that the Probable Link Report "showed a positive trend of increasing relative risk with increasing cumulative exposure," and that Mr. Vigneron was at the "highest level of exposure." (Def.'s Reply at 6-7.)
DuPont first argues that Dr. Bahnson improperly relied upon the Science Panel's reports and opined on the quality of the Science Panel study. DuPont is correct that the Court has not previously permitted the parties' expert witnesses to give their opinion about the quality of the Science Panel's study, and Dr. Bahnson will not be permitted to affirmatively offer his opinion about how well the Science Panel conducted its work. The quality of the Science Panel's work is simply not relevant to this litigation because the parties contracted to have the Science Panel's studies done and have contractually agreed to be bound by the conclusions reached in them. However, every expert who reviews the Science Panel's Reports certainly has a professional opinion as to the quality of the work. That fact does not necessarily work to make the expert's opinion unreliable.
As for the testimony DuPont cites related to the content of the Science Panel Reports, it appears that Dr. Bahnson was answering questions about the Report and reading some of what the Science Panel found. (Bahnson Dep. at 178-181, ECF No. 4641-5) (starting the exchange with the question from defense counsel: "What does the C8 Science Panel say the increase risk was for somebody like Mr. Vigneron for developing testicular cancer ?"; Dr. Bahnson continues the exchange reading what the Science Panel did, e.g. , "I believe they quote relative risks" and "I believe they did a number analyses ...."). DuPont argues that "these 'considerations' are the exact type of evidence that the Court ruled inadmissible in DMO 1 and DMO 1-A, meaning Dr. Bahnson should not be permitted to base his opinions on these alleged considerations in Plaintiff's case." (Def.'s Reply at 8.)
DuPont is correct that the issue of relying on statements within portions of the Science Panel Reports that refer to, for instance relative risks and quartile positions of Class Members, has been brought before the Court in DMO 1 and DMO 1-A. But, each time the issue was presented to the Court it was presented by DuPont for the purpose of challenging general causation, i.e. , whether a particular Class Member's dose of C-8 was sufficient to be capable of causing the Linked Disease. (DMO 1) ("DuPont concludes that because of these 'limitations' within the Science Panel's Probable Link [Reports], it is the individual plaintiffs' burden to show,... that that dose was sufficient to cause the disease at issue.' "); (DMO 1-A at 7) ("DuPont continues, the parties must have their experts determine the limitations reflected in the Probable Link evaluations to determine whether the member of the Leach Class had sufficient exposure to C-8 for it to be capable of causing his or her Linked Disease."). DuPont has contractually agreed that it would not contest whether a Leach Class Member's dose of C-8 was *666 sufficient to be capable of causing his or her Linked Disease.
As to Dr. Bahnson's reliance on the Science Panel's Reports, first the Court notes that he has testified that it is the Science Panel's Finding that was necessary as a basis for his specific causation opinion. (Bahnson Dep. Tr. at 183.) With regard to Dr. Bahnson's testimony regarding specific protocols or inquiries that the Science Panel made and reported in reaching their Probable Link Finding, the Court has addressed this exact issue in the Freeman trial, when trial counsel pursued a similar line of cross examination as did defense counsel in the Vigneron deposition of Dr. Bahnson - both resulting in the same testimony from Dr. Bahnson. In Freeman , after questioning Dr. Bahnson, DuPont's counsel requested a side bar and the following exchange occurred:
MR. MACE [for DuPont]: So, the fact that [Dr. Bahnson] considered and relied on the Science Panel report's already been established. I have a redacted copy of the Science Panel report that I will make a Court's record exhibit, not go back to the jury, but I would seek to use that with this witness and move it into evidence.
THE COURT: Are you going to tell me for what purpose?
MR. MACE: Yes. It's with regard to his understanding of what the Science Panel did and the fact that they've looked at increasing risk of increasing dose and with regard to what their findings were with respect to cancer.
MR. BILOTT [For Mr. Freeman]: Absolutely -
THE COURT: To me, this is a simple issue. The [Leach Settlement] agreement that DuPont signed with the plaintiffs said -- there is no gradation. Either general causation is at issue or it isn't. And if this somehow goes to specific causation -- but I don't see how it does -- it seems to me it's an attack, because the panel only addressed general causation . So, to the extent we're going to go through this and use this report to undercut the finding that's binding in this case of general causation, I'm going to go ahead -
MR. MACE: Okay. My contention is it goes to specific causation.
THE COURT: You can ask him questions on specific causation, but you can't do that with general cohorts and general questions about exposure limit. That's not specific causation. That's general causation.
MR. MACE: But the fact that the Science Panel found increasing risk with increasing levels of exposure -
THE COURT: He said he's read this.
MR. MACE: Right.
THE COURT: You've cross examined. You've already said -- Well, first of all, they're at .05. And I'm looking at numbers that are -- You saw the same numbers I did -- 50 times or more. And we're going to get right back into that again, it would seem to me.
MR. BILOTT: Your Honor, just to be clear, it's the plaintiff's position this has been ruled inappropriate from day one, and in several orders of the Court, that DuPont is not allowed to use the Science Panel's report in any way.
THE COURT: Yeah.
MR. BILOTT: And that's been your ruling from day one.
THE COURT: Well, there might be some slight probative value on specific causation, but there's overwhelming unfair prejudice on the other end [i.e. , calling into question whether C-8 is capable of causing the disease]. So it's out under [Fed. R. Evid.] 403.
MR. MACE: All right. So, and then I -- also, we used Exhibit 14 in his deposition, *667 which is P1.5483, where he acknowledged that, in fact, the Science Panel found a decrease in risk with increase in exposure for somebody in the second quartile. We would use that if we were allowed.
THE COURT: That's the same issue and my same ruling.
(June 7, 2016, Freeman Trial Tr. at 174-76, Freeman ECF No. 112.) The Court is not inclined to change its position from the one stated in Freeman and quoted above.
DuPont next argues that "Dr. Bahnson could not have ruled out the possibility of unknown causation merely because Mr. Vigneron is a class member and there are allegedly no other applicable risk factors." (Def.'s Reply at 9.) DuPont argues that this is circular logic that has been rejected by numerous courts. This Court, however, disagrees.
The Court addressed DuPont's arguments related to circular reasoning in EMO 4 and will not reiterate that decision here. (EMO 4 at 20-24) (addressing DuPont's argument that "Dr. Bahnson engages in circular reasoning that has been soundly rejected as legally insufficient by numerous courts in situations like the one present here."). The Court only notes here that by their contractual agreement in the Leach Case, the parties have created a closed universe with regard not only to the individuals to whom the Science Panel Findings apply, but also the way in which the parties are bound to litigate the issue of causation.
As to Dr. Bahnson's specific assessment of Mr. Vigneron, he first "ruled out" alternative potential risk factors for testicular cancer based on Mr. Vigneron's medical history and Dr. Bahnson's physical examination of Mr. Vigneron, and was then left with the empirical evidence provided by the Probable Link Finding that it is more likely than not that there is a link between C-8 and the Leach Class members' Linked Diseases. He reviewed the data collected through the C-8 Health Project showing the amount of C-8 that was in Mr. Vigneron's blood, and he reviewed Dr. MacIntosh's expert report, which showed Mr. Vigneron's exposure history and confirmed him as a Leach Class member. As such, Dr. Bahnson does not conclude that C-8 was the cause of Mr. Vigneron's testicular cancer simply because of the existence of one known risk factor, as DuPont posits. Instead, Mr. Vigneron's status as a Class Member, coupled with the empirical evidence from the Probable Link Report, along with his review of Plaintiff's medical history (regarding testicle placement, lack of family history of testicular cancer, HIV positivity and/or AIDS, carcinoma in situ or a previous cancer in the opposite testicle), his physical examination of Mr. Vigneron, the relevant factual data related to his age, race, ethnicity and body size, and reliance on his 30 years of experience as a medical doctor and cancer specialist, all contributed to his expert opinion on specific causation.
2. Relevant Risk Factors
As to the risk factors Dr. Bahnson considered, he states in his expert report:
[A]ccording to the American Cancer Society, the risk factors for development of testicular cancer include an undescended testicle, family history of testicular cancer, HIV positivity and/or AIDS, carcinoma in situ of the testicle ["ITGCN"], a previous cancer in the opposite testicle, age, race and ethnicity, and body size.
(Bahnson Rep. at 6, ECF No. 4640-2.)
DuPont argues the Dr. Bahnson "failed to rule in or reliably exclude several other relevant risk factors for testicular cancer in Plaintiff's case without any scientifically valid, reasonable explanation." (Def.'s Mot. at 13) (citing Best v. Lowe's Home Ctrs., Inc. , 563 F.3d 171, 179 (6th Cir. 2009)
*668 ("[T]he doctor must provide a reasonable explanation as to why he or she has concluded that any alternative cause suggested by the defense was not the sole cause"). DuPont offers as "[e]xamples of this fundamental flaw in Dr. Bahnson's methodology includes his treatment (or lack thereof) of the following risk factors": ITGCN, undescended testicle, family history, and occupational history. Id. (arguing, for example, that because there are no records of Mr. Vigneron's testicular placement at his birth, Dr. Bahnson "lacked sufficient information to rule out an undescended testicle as a possible cause of Plaintiffs cancer"). Mr. Vigneron responds that none of the four risk factors argued by DuPont is present anywhere in Mr. Vigneron's medical history, and thus are easily ruled out as a likely substantial contributing factor to the development of his testicular cancer. (Pl.'s Mem. in Opp. at 22.) This Court agrees.
Dr. Bahnson's expert report and deposition testimony regarding ITGCN, undescended testicle, and family history were appropriately considered and ruled out in Dr. Bahnson's differential diagnosis. DuPont's arguments go to the weight of Dr. Bahnson's opinions, not to their admissibility. Best v. Lowe's Home Centers, Inc. , 563 F.3d 171, 182 (6th Cir. 2009) (citing as examples Kudabeck v. Kroger Co. , 338 F.3d 856, 861-62 (8th Cir.2003) ("[A]ttacks regarding the completeness of [a doctor's] methodology go to the weight and not the admissibility of his testimony.")
As to the occupational history, DuPont acknowledges that Dr. Bahnson considered Mr. Vigneron's occupational history of exposure to potential carcinogens. DuPont, however, takes issue with Dr. Bahnson's failure to mention specifically that "Mr. Vigneron reported that he worked for years in a feed store that sold livestock feed and that he worked on logging wells." (Def.'s Mot. at 14) (relying on Luongo Rep. at 6, ECF No. 4639-6) ("Dr. Bahnson does not say anything about these occupational exposures."). DuPont concludes that "Dr. Bahnson's failure to properly consider, and exclude, these risk factors from his differential etiology in Plaintiff's case renders his differential etiology unreliable, and his specific causation opinion should be excluded on this basis." Id. This Court disagrees.
As Mr. Vigneron points out, there is no disagreement from DuPont's specific causation rebuttal expert that livestock feed and working at logging wells are not well accepted risk factors for testicular cancer. (Pl.'s Mem. in Opp. at 17-19) (citing Dr. Luongo's testimony at 69-72). Indeed, Mr. Vigneron moves to exclude Dr. Luongo's testimony related to these two proposed risk factors, which the Court addresses infra. Even if, however, these two factors are appropriately considered as probable risk factors for testicular cancer, "doctors need not rule out every conceivable cause in order for their differential-diagnosis-based opinions to be admissible." Best , 563 F.3d at 181 ; id. at 179 ("The core of differential diagnosis is a requirement that experts at least consider alternative causes.' "). " 'The fact that several possible causes might remain uneliminated ... only goes to the accuracy of the conclusion, not to the soundness of the methodology.' " Jahn , 233 F.3d at 390 (citation omitted).
B. Opinions Regarding Age and Causation
DuPont argues that "any claim that [Mr. Vigneron]'s cancer was atypical and C-8 related because of his age at diagnosis is false, speculative, and unreliable and should be excluded." (Def.'s Mot. at 14) (emphasis added). In other words, DuPont contends that Dr. Bahnson's expert opinion should be excluded because it sets forth the false, speculative claim mat age of cancer onset indicates C-8 causation, *669 i.e. , "that some connection has been made between C-8 exposure and the development of testicular cancer at a certain age, which, as he conceded at his deposition, is a theory without any scientific foundation whatsoever." (Def.'s Mot. at 15.) Specifically, DuPont states:
Dr. Bahnson's unsupported, and inaccurate, opinion that Plaintiff's testicular cancer was atypical based solely on his age at which Plaintiff was diagnosed-a purported one- to two-year deviation from the age range at which the majority of testicular cancers are diagnosed-should be excluded. See Bahnson Depo. at 123:15-19 ("Q. And again, it's your opinion that because of his age at the time of diagnosis, this makes his presentation atypical? A. Yes, he is much older than the patients that in my career I've seen with testicular cancer. The overwhelming majority of mem have been much younger." (objection omitted) ). Simply put, his conclusion lacks ... support. The indisputable SEER[4] statistics show that, at 37 years old at the time of diagnosis, Plaintiff was in the second most frequent age-group for testicular cancer diagnosis. That sole fact renders Dr. Bahnson's claim that Plaintiff's testicular cancer was "atypical" because of his age at diagnosis unsupportable and misleading.
Id. at 14 (footnote added). DuPont continues, explaining it previously raised this argument in its motion to exclude Dr. Bahnson's expert opinion in the Freeman trial:
Although Dr. Bahnson offered similar opinions in his reports and deposition testimony in Mr. Freeman's case, the Court has not previously ruled on this issue, finding it moot because (apparently recognizing the baseless nature of the opinion) Plaintiff's counsel agreed that Dr. Bahnson would not testify at trial that Mr. Freeman's age at diagnosis was indicative of C-8 caused testicular cancer. See Freeman , No. 2:13-CV-1103, EMO No. 4 [ECF No. 4518] at 24-25.
However, during the Freeman trial, Dr. Bahnson did exactly what Mr. Freeman's counsel said he would not do. See, e.g. , June 7, 2016 Trial Tr, [Freeman ECF No. 112] at 146:10-147:5 ( ["W]hen I looked at Mr. Freeman, his age , his exposure, which was nearly seven years, to the compound in the drinking water and coupled that with the fact that his tumor was also an unusual tumor .... So, putting this all together, knowing that he had exposure for a prolonged period of time, in the drinking water, to C-8, and ruling out these other factors, and then him being outside what I consider to be the sweet spot for someone developing testicular cancer , and finally the fact that it was this unusual tumor, that's what led me to my conclusion [that C-8 caused Mr. Freeman's cancer ]" (emphasis added) ).
Id. at 15-16 (emphasis added by DuPont). DuPont explains that "Dr. Bahnson's deposition testimony in [Mr. Vigneron]'s case makes clear that he intends to present this same speculative, unreliable opinion at [Mr. Vigneron]'s trial in November." Id. ("The Court should give no weight to any promises not to introduce certain opinions mat have been given over and over again, and should affirmatively exclude this testimony in its entirety.").
DuPont's characterization of Dr. Bahnson's opinions and the plaintiffs' counsel's promises related to Dr. Bahnson's testimony are inaccurate on several fronts. First, Dr. Bahnson does not testify that some connection has been made between C-8 exposure and the development of testicular *670 cancer at a certain age. DuPont misunderstands and/or misconstrues Dr. Bahnson's testimony. Dr. Bahnson testified that Mr. Vigneron's age at the time of diagnosis makes his presentation atypical - not that the age of cancer onset indicates C-8 causation.
Second, Dr. Bahnson's conclusion that it is atypical for testicular cancer top resent at age 37 is not "unsupporablt and misleading" as DuPont asserts. (Def.'s Mot. at 14.) DuPont itself points out that the "indisputable SEER statistics show that, at 37-years old at the time of diagnosis, Plaintiff was in the second most frequent age-group for testicular cancer diagnosis." Id. In other words, DuPont does not dispute that the majority of cases of testicular cancer, nearly 50% of new cases according to the SEER data and DuPont's own expert witness, are diagnosed when a man is between the ages of 20-34. (SEER Data Fact Sheet, ECF No. 4657-1); (Expert Report of Dr. Dominik Alexander at 19, ECF No. 4639-1) ("testicular cancer is most common cancer among young white men ages 20-34."). DuPont does not dispute that Mr. Vigneron was not between the ages of 20 and 34 when his testicular cancer was diagnosed. Dr. Bahnson simply opines, as part of his differential diagnosis methodology, that because Mr. Vigneron was outside the age range when testicular cancer is most frequently diagnosed, it renders it atypical and less likely that age was the cause of his testicular cancer. This is a supportable conclusion.
Third, it is inaccurate to say that Dr. Bahnson's opinion that Mr. Vigneron's testicular cancer was atypical was "based solely " on the age at which Mr. Vigneron was diagnosed. Dr. Bahnson's expert report and his testimony unequivocally show that he considered age as a risk factor for Mr. Vigneron's testicular cancer, and then ruled it out based on his thirty years of experience working with men suffering from testicular cancer and the SEER categories. As just one example of Dr. Bahnson's testimony shows:
Q. And am I correct, Dr. Bahnson, that you rule out age as a factor in Mr. Vigneron's development of testicular cancer because he was older than the typical testicular cancer patient when his developed?
A. Correct.
Q. Okay. And you opined that testicular cancer is most frequently diagnosed between the ages of 20 and 34?
A. I did.
Q. And I believe that's based on the SEER data that you provided me with this morning that we've marked as an exhibit?
A. Yes.
Q. And again, it's your opinion that because of his age at the time of diagnosis, this makes his presentation atypical?
A. Yes, he is much older than the patients that in my career I've seen with testicular cancer. The overwhelming majority of them have been much younger.
(Bahnson Dep. at 122-23) (emphasis added).
To the extent DuPont believes that Dr. Bahnson's testimony is misleading because "at 37 years old at the time of diagnosis, Plaintiff was in the second most frequent age-group for testicular cancer diagnosis," it may cross examine Dr. Bahnson on this issue, which goes to weight, not admissibility.
Fourth, and last, DuPont is correct that "Plaintiff's counsel agreed that Dr. Bahnson would not testify at trial that Mr. Freeman's age at diagnosis was indicative of C-8 caused testicular cancer." (Def.'s Mot. at 15.) However, DuPont is incorrect that Mr. Freeman's counsel elicited that opinion from Dr. Bahnson at trial. As is *671 shown above, Dr. Bahnson did not testify anywhere that age was indicative of C-8 causation.
C. Methodology Regarding Opinions on Secondary Illness
DuPont posits that "Dr. Bahnson failed to conduct a valid differential etiology to reach his unsubstantiated opinion that chemotherapy caused Plaintiff's alleged peripheral neuropathy." (Def.'s Mot. at 16.) And, DuPont continues stating that "[a]t his deposition, Dr. Bahnson conceded that Plaintiff's medical records report no relationship between his claimed peripheral neuropathy and his chemotherapy treatment, and that this was his own affirmative causation opinion." Id. (citing Bahnson Dep. at 165.) Finally, in its reply brief, DuPont noted that Mr. Vigneron "should not be permitted to use Dr. Bahnson's deposition testimony to try to save his deficient expert report on this issue.... [and that] even if the Court considers Dr. Bahnson's deposition testimony as part of this analysis, his testimony confirms that he did not employ a reliable differential etiology in reaching his opinion on the cause of [Mr. Vigneron]'s alleged peripheral neuropathy, especially considering the fact that he admitted that he did not even know that the cause of peripheral neuropathy is unknown in the majority of cases." (Def.'s Reply at n. 18) (citing to Bahnson Depo. at 166.)
Mr. Vigneron disagrees, responding first, that the case law upon which DuPont relies does not stand for the proposition that Dr. Bahnson is required to provide the same methodological analysis for sequela related to the underlying condition as for the underlying condition itself. Mr. Vigneron secondarily contends that, even if Dr. Bahnson is required to provide a differential diagnosis to support his opinion related to peripheral neuropathy, he has done so.
The parties are both partially correct. DuPont is right that, as this Court held in EMO 5, "[a]ffirmative opinions of causation must be valid and reliable to be admitted." (EMO 5 at 24) (citing Daubert , 509 U.S. at 589, 113 S.Ct. 2786 ; Fed. R. Evid. 702 ). Mr. Vigneron has provided no support for his position that affirmative causation opinions about a condition that is the consequence of a previous disease of injury are not subject to Evidence Rule 702 and Daubert . Mr. Vigneron, however, is correct that Dr. Bahnson's deposition testimony reflects that he has sufficiently considered and ruled out other potential risk factors for Mr. Vigneron's peripheral neuropathy. And, for the same reasons discussed supra , Dr. Bahnson's deposition testimony appropriately supplements and explains his expert opinion. Thompson , 470 F.3d at 1203.
Q. In your report, Doctor, you conclusively state that Mr. Vigneron's chemotherapy regime caused him to develop peripheral neuropathy, right?
A. Correct.
Q. What is peripheral neuropathy ?
A. Well, neuropathy is a term that just means a disease of the nerves. And peripheral means that it's part of the peripheral nervous system as opposed to the central nervous system. And with platinating agents, we commonly refer to it as a stocking glove neuropathy where you develop paresthesias, hypesthesias, and numbness and tingling-type symptoms in your feet and your hands. And in some cases you -- as a consequence of the platinum you also develop a Raynaud's type of phenomenon where exposure to cold can cause severe and profound ischemia of feet and hands.
Q. Now, just to be clear, in your review of Mr. Vigneron's medical records, you didn't see any mention of Mr. Vigneron's *672 peripheral neuropathy being caused by his three cycles of chemotherapy, did you?
A. Other than my assessment when I saw him, I don't believe I did.
Q. Okay. You would agree with me, though, that chemotherapy is not the only risk factor for peripheral neuropathy ?
A. Yes.
Q. Do you know what some of the other risk factors are?
A. Diabetes is probably the biggest one. Any of the demyelinating diseases can do that. So there's a whole host of neurologic diseases that can do that.
Q. And did you rule in any of those other risk factors before concluding that Mr. Vigneron's peripheral neuropathy was caused by his prior chemo?
A. He didn't have any history of anything that would lead him to have that problem. So it's, again, my opinion to a degree of medical certainty that his neuropathy that he's experiencing with this location is due to his treatment with platinum.
Q. So in answer to my question, you would testify and tell the jury that you did in fact rule in other risk factors?
A. Yes.
Q. Okay. And are you aware that the cause of peripheral neuropathy is unknown in the majority of cases?
A. I would have to check.
Q. So sitting here today, you can't say that for sure?
A. That the cause is unknown in most cases? No, I'd have to see some substantiation of that.
(Bahnson Dep. at 164-66.)
Dr. Bahnson's testimony reflects that he considered that chemotherapy, diabetes, demyelinating diseases, and neurologic diseases as risk factors for peripheral neuropathy and that he ruled those out based on Mr, Vigneron's medical history. The Court disagrees with DuPont's characterization of and/or the inference that may be drawn from Dr. Bahnson's testimony regarding unknown causation. In any event, criticism of the conclusions drawn by Dr. Bahnson when assessing the generally accepted risk factors for peripheral neuropathy go to the weight of the evidence, not its admissibility, and is appropriately left to "[v]igorous cross-examination [and] presentation of contrary evidence" rather than exclusion. Daubert , 509 U.S. at 596, 113 S.Ct. 2786 ; United States v. Davis , 103 F.3d 660, 674 (8th Cir. 1996) (noting that the defendant was "free to challenge the expert's conclusions and point out the weaknesses of the [expert's] analysis to the jury during cross-examination" but "[w]eight and credibility are the province of the jury.").
D. Increased Risk Opinions
DuPont's last arguments related to Dr. Bahnson is that his "increased risk opinions are irrelevant and unreliable and should be excluded." (Def.'s Mot. at 17.) Specifically, DuPont argues that (1) Mr. Vigneron "cannot recover under Ohio law for mere increased risk," and that Dr. Bahnson should, for various reasons, not be permitted to opine on (2) increased risk of chemotherapy-related complications and need for continued radiographic imaging and (3) increased risk of developing other Linked Diseases.
1. Ohio Law and Increased Risk
DuPont contends that, "[u]nder Ohio law, a plaintiff can only recover for "increased risk" if the condition is 'reasonably certain' to occur." (Def.'s Mot. at 17) (citations omitted). DuPont concludes that, based on its assessment of Dr. Bahnson's expert report, "he falls short (as he must) of opining that any of th[e] conditions [about which he opines] are 'reasonably *673 certain' to occur in the future." Id. at 17-18. DuPont's argument is not well taken.
DuPont made this same argument with regard to Dr. Bahnson's increased risk opinions in Freeman . The Court explained its reasoning in detail there, and will repeat some of that decision here because it impacts two new arguments that were not addressed in Freeman , and are addressed at (2) and (3) below. In addressing this same argument in EMO 4, the Court stated:
DuPont argues that the evidence supporting either of these propositions is not "reasonably certain" which is required under Ohio law .... In his opposition memorandum, Mr. Freeman indicates that he does not offer the evidence to prove that he will develop cancer in the future, but instead to support his emotional distress, which he alleges manifested itself as cancerphobia.
"Cancerphobia is a claimed present injury consisting of mental anxiety and distress over contracting cancer in the future, as opposed to risk of cancer, which is a potential physical predisposition of developing cancer in the future." Cantrell v. GAF Corp. , 999 F.2d 1007, 1012 (6th Cir. Ohio 1993) (quoting Lavelle v. Owens-Corning Fiberglas Corp. , 30 Ohio Misc. 2d [11] 14 [507 N.E.2d 476] (1987) ).
....
To recover th[e] requested damages for cancerphobia, Mr. Freeman must show that he was aware that he in fact possesses an increased statistical likelihood of developing cancer, and that from this knowledge springs a reasonable apprehension which manifests itself in mental distress. See Cantrell v. GAF Corp. , 999 F.2d 1007 (6th Cir. 1993) (citing Lavelle, supra , for the proposition that damages for cancerphobia were available as a portion of damages in a negligence action where the plaintiffs suffered a contemporaneous physical injury, if the plaintiff could show that he "is aware that he in fact possesses an increased statistical likelihood of developing cancer, and that from this knowledge springs a reasonable apprehension which manifests itself in mental distress").
Consequently, as the Sixth Circuit has recognized, "[e]vidence of an increased risk of cancer is relevant to whether a plaintiff's fear of cancer is reasonable, as required by Lavelle .... [and] [t]his evidence, in addition to the evidence that [a plaintiff] had an actual fear or concern about the risk of cancer were the necessary predicates for the mental anguish damages they sought." Id. at 1012 (holding that "[t]he district court's admission of the risk of cancer evidence was therefore proper"). Accordingly, the evidence Mr. Freeman seeks to introduce related to his alleged increased risk of developing cancer is relevant and probative.
(EMO 4 at 25-27.)
Therefore, like in Freeman , here, Mr. Vigneron does not offer Dr. Bahnson's to prove that he will develop cancer in the future, but instead to support his emotional distress, which he alleges manifested itself as cancerphobia.
2. Chemotherapy-Related Complications and Continued Radiographic Imaging
DuPont contends that there is no reliable scientific support for Dr. Bahnson's opinions related to chemotherapy and radiographic imaging. With regard to the former, Dr. Bahnson opines that because of the three cycles of chemotherapy Mr. Vigneron was required to take after his 1997 operation to remove his cancerous testicle, he is at an increased risk of "developing lung damage and breathing disorders, *674 hearing loss, acute myelogenous leukemia, and myelodysplasia." (Bahnson Rep. at 7, ECF No. 4640-2.) DuPont asserts that "Dr. Bahnson provided no support for his theory that Plaintiff is still at increased risk of developing chemotherapy-related complications in his expert report." (Def.'s Mot. at 19.) DuPont relies upon an in limine ruling from the Freeman trial, stating:
This Court already ruled in this MDL that if a plaintiff has been exposed to a risk factor for a disease, but an extended period of time passed between the exposure and the onset of disease, then evidence related to that exposure is inadmissible unless specific, reliable scientific evidence indicates that the risk factor could still cause the disease after a significant period of latency. See Freeman , No. 2:13-CV-1103, MIL Order No. 10 [ECF No. 4554] at 9 (excluding reference to Mr. Freeman's past marijuana use and smoking from decades prior and questioning whether an expert could show that smoking still presented an increased risk twenty years after quitting).
Id. DuPont's argument is not well taken.
In MIL 10, the Court did discuss the admissibility of expert opinion related to risk factors for testicular cancer. Mr. Freeman moved to exclude DuPont's expert's testimony that marijuana and alcohol are potential risk factors for testicular cancer, and therefore, Mr. Freeman's limited use of these substances should not be considered by the jury. In that decision, the Court explained that DuPont's expert failed to offer any scientific support for the proposition that limited use of marijuana and/or tobacco are risk factors for testicular cancer, let alone whether they are risk factors after two decades. Further, DuPont's expert did not contend that alcohol and/or marijuana use are risk factors that are generally accepted in his field of expertise.
Leaving aside the potential prejudice of testimony related to illegal drug use, MIL 10 is unhelpful here. In the present situation, unlike the facts presented in MIL 10, Dr. Bahnson's opinion is based on generally accepted knowledge in his field of expertise, scientific literature, and professional experience. Specifically, Dr. Bahnson testified that "it is generally-accepted in the scientific community that a person in the position of Mr. Vigneron is still at an increased risk of developing these chemo-related complications." (Bahnson Dep. at 162.)
Further, Dr. Bahnson identified two articles in support of his opinions that Mr. Vigneron is at an increased risk of a secondary cancer, one of which states that "[m]en with testicular cancer continue to be at significantly elevated risk of second malignant neoplasms for more than two decades following initial diagnosis.... [and that] "[s]econdary leukemia was associated with both radiotherapy and chemotherapy." Travis et al., Risk of second malignant neoplasms among long-term survivors of testicular cancer , J. NATL. CANCER. INST., 89(19): 1429-39 (1997). Finally, Dr. Bahnson also testified that he has had a patient who had chemotherapy-related complications almost twenty years after treatment. (Bahnson Dep. at 163.)
In its reply brief, DuPont still takes issue with the relevance of the scientific literature and the "single patient" information on which Dr. Bahnson relies. However, the literature appears to support Dr. Bahnson's opinion and, importantly, Dr. Bahnson testified that his position is one that is generally accepted in his field. "The question of whether [the expert's] opinion is accurate in light of his use of [certain data] goes to the weight of the evidence, not to its admissibility." In re Scrap Metal Antitrust Litig. , 527 F.3d 517, 531-32 (6th Cir. 2008) (stating that "the *675 district court appropriately passed the torch to the jury to make this determination.").
As to DuPont's latter argument, Dr. Bahnson opines that, "due to Mr. Vigneron's extensive C-8 exposure, he likewise will require radiographic imaging and physical examinations for the remainder of his life." (Bahnson Rep. at 7, ECF No. 4640-2.) DuPont takes issue with this statement, arguing that, "[a]t his deposition, Dr. Bahnson conceded that this recommendation is completely contrary to the most-recent National Comprehensive Cancer Network's guidelines for the treatment of testicular cancer, which Dr. Bahnson recognizes as typically authoritative, only recommend radiographic imaging for two years after the patient has responded to chemotherapy." (Def.'s Mot. at 23) (citing Bahnson Depo. at 147-53.) DuPont contends that, when an expert expresses an opinion which is not generally accepted within the medical and scientific communities, he has an obligation to provide a reasoned explanation of why his methodology and opinions differ. Id. (relying on, inter alia, Conde v. Velsicol Chem. Corp. , 804 F.Supp. 972, 1024 (S.D. Ohio 1992).
DuPont is correct that Dr. Bahnson testified that "it would be atypical for [physicians] not to look at [the Comprehensive Cancer Network's] guidelines to make sure that, you know, they were well informed about what they should potentially be doing for people" and that these guidelines did not specify radiographic surveillance after year three." (Bahnson Dep. at 150, 153.) However, Dr. Bahnson testified specifically that the guidelines "are not rules" and that "the strength of the recommendation" is discretionary with the practitioner. Id. at 151. Dr. Bahnson explained why his opinion differed from the guidelines, based on the fact that Mr. Vigneron was exposed to three rounds of chemotherapy with three separate agents. Id. at 152. Dr. Bahnson testified that his "opinion related to the follow-up of individuals who are exposed to multiagent chemotherapy for treatment of their testis cancer [that] to stop seeing them [after the three years], in my opinion, would be tantamount to malpractice." Id. at 152. Dr. Bahnson's explanation is a reasoned one, and therefore, the fact that his opinion is different than the guidelines goes to the weight of the evidence, not its admissibility. Evidence that may be seen as conflicting is directly within the jury's purview. In re Scrap Metal Antitrust Litig. , 527 F.3d at 531-32 ("The question of whether [the expert's] opinion is accurate in light of his use of [certain] data goes to the weight of the evidence, not to its admissibility [.]").
3. Increased Risk of Developing Other Linked Diseases
DuPont asks for exclusion of Dr. Bahnson's opinion in his expert report that "as a result of his extensive C8 exposure, Mr. Vigneron also has an increased statistical likelihood of developing each of the other Probable Link diseases." (Bahnson Rep. at 7, ECF No. 4640-2.) Both parties agree that this evidence is to support Mr. Vigneron's cancerphobia allegations. DuPont has filed a Motion for Summary Judgment on that issue, asking the Court to prohibit testimony related to the statistical likelihood of developing other Linked Diseases. (ECF No. 4656.) The Court granted DuPont's request in DMO 20, in which it granted in part and denied in part DuPont's motion regarding cancerphobia damages. Consequently, Dr. Bahnson's opinion on the statistical likelihood of developing other Linked Diseases "does not relate to any issue in the case" and is therefore "not relevant." Daubert , 509 U.S. at 590-91, 113 S.Ct. 2786.
IV.
DuPont offers expert witness Dr. Luongo to rebut Dr. Bahnson's specific causation *676 opinions. Mr. Vigneron challenges Dr. Luongo's deposition testimony and/or opinions in his expert report, arguing that (A) he offers an affirmative causation opinion that was not reached using proper methodology, (B) his opinions challenge general causation in violation of the Leach Settlement Agreement, and (C) he offers unreliable opinions related to alternative causes.
A. Affirmative Causation Opinion
Mr. Vigneron challenges Dr. Luongo's deposition testimony that "based on [his] review of the case, [his] opinion would be that the cause [of Mr. Vigneron's testicular cancer ] is, is unclear. It's unknown." (Dep. at 12:12-17.) Mr. Vigneron contends that, Dr. Luongo failed to engage in a reliable differential diagnosis to reach his affirmative causation opinion.
DuPont does not dispute that this testimony would constitute an affirmative causation opinion. Rather, DuPont asserts the following:
Plaintiff focuses on testimony from Dr. Luongo's deposition, where, only after being directly and repeatedly questioned about his belief as to what caused Plaintiffs cancer (and over opposing counsel's objection that made it clear such testimony was outside the scope of what Dr. Luongo was asked to do in this case) , Dr. Luongo stated his belief was that the cause of Plaintiffs testicular cancer is unknown. See Plaintiff's Mot. at 11. This is Dr. Luongo's personal opinion, and DuPont represents to the Court (as it represented during Dr. Luongo's deposition) that it does not intend to offer this opinion at trial, unless Plaintiff opens the door to it, like Plaintiff did in deposition. See Pl.'s Mot. at 11.
(Def.'s Mem. in Opp. at 3) (emphasis in original) (citing to Pl.'s Mot. at 11) (citing to Luongo Dep. at 12.).
Initially, the Court notes that Dr. Luongo's deposition testimony does not reflect that he "only" offered this affirmative causation testimony after counsel "opened the door to it" by "directly and repeatedly question[ing] [him] about his belief as to what caused Plaintiff's cancer (and over opposing counsel's objection that made it clear such testimony was outside the scope of what Dr. Luongo was asked to do in this case)." Contrarily, the deposition shows that Dr. Luongo was sworn in, answered a few questions about being retained by DuPont and the amount of hours he billed for the Vigneron case, then the very first question regarding Dr. Luongo's opinion was asked and was not objected to:
BY [Mr. Vigneron's counsel] MR. O'BRIEN:
Q. So let me ask you now about - before we get into specifics, with this -- of all the time that you've spent on -- specific to Mr. Vigneron's case, have you come to an opinion to a reasonable degree of medical probability that any specific risk factor caused Mr. Vigneron's testicular cancer ?
A. Have I determined with reasonable degree of medical certainty? I -- I would say a specific cause, no. I think, you know, based on my review of the case, I think there - it's -- my opinion would be that the cause is, is unclear. It's unknown -
Q. Okay.
(Luongo Dep. at 12.)
That being said, because DuPont does not intend to offer Dr. Luongo's affirmative causation opinion that Mr. Vigneron's cancer was the result of an unknown cause, the issue of whether the opinion was reached utilizing a reliable differential diagnosis is moot
B. General Causation
Mr. Vigneron seeks to exclude portions of Dr. Luongo's statements/opinions, contending that they "relate specifically to *677 General Causation, as defined in the Contract, [and] are [therefore] inadmissible and irrelevant." (PL's Mot. at 9.) The Court has divided the statements/opinions into three categories: (1) the absence of a serum, tissue, imaging, or genomic based test, (2) improper reliance on the Science Panel's Reports, and (3) C-8 as not generally accepted as a risk factor for testicular cancer.
1. The Absence of a Serum, Tissue, Imaging, or Genomic Based Test
Mr. Vigneron first asserts:
Dr. Luongo challenges the Science Panel's basic finding that proof of Mr. Vigneron's C-8 exposure as a Class Member is sufficient to show exposure capable of causing his testicular cancer by stating that "... there is no serum, tissue, imaging or genomic test that can determine whether Mr. Vigneron's testicular cancer was caused by C8."
(Pl.'s Mot. at 9-10) (citing Luongo Rep. at 6, ECF No. 4639).
Mr. Vigneron argues that Dr. Luongo's opinion goes to general causation because
Plaintiff is not required to identify and/or adduce any sort of serum, tissue, imaging and/or economic test in order to prove that, more likely than not, C-8 was a substantial contributing factor to the development of Mr. Vigneron's testicular cancer. Thus, allowing DuPont's expert to opine misleadingly that such a test is necessary for the purposes of specific causation undercuts DuPont's agreement not to contest General Causation. This is because there is no specific individual for whom such a test would exist, and thus, in essence, with this opinion, Dr. Luongo is opining that it is not possible in any instance to ever find that C-8 caused someone's cancer, which effectively eliminates General Causation.
(Pl.s' Mot. at 10) (emphasis added).
DuPont responds that
Dr. Luongo is merely explaining that Dr. Bahnson could not have relied on any laboratory test to reach his conclusion that C-8 exposure caused Plaintiff's testicular cancer. The lack of any valid laboratory test is only one of several factors Dr. Luongo considered in his opinion that Dr. Bahnson could not have reliably determined that C-8 likely caused Mr. Vigneron's testicular cancer. In no way does this opinion regarding laboratory testing challenge this Court's rulings regarding the issue of what "dose" is sufficient to be capable of causing a Probable Link disease. Additionally, contrary to Plaintiff's mischaracterization, Dr. Luongo did not opine that any specific test is required to determine specific causation. In fact, Dr. Luongo expressly testified that such a test is not necessary to determine specific causation. See Luongo Depo. at 101:4-17 ("Q. So is it your testimony that ... for you to come to the opinion that C-8 caused a particular person's testicular cancer, that there would have to be a test, medical test or assay that would give you the information that this was a C-8-induced cancer ? A. It would be tremendously helpful, but no[ ] - it would not be a necessity." (objection omitted) ).
(Def.'s Mem. in Opp. at 11.)
In reply, Mr. Vigneron maintains that Dr. Luongo's reference to a non-existent test is a back door way to contest whether it is possible for any expert to ever properly conclude that C-8 caused testicular cancer. In other words, Dr. Luongo's opinion about a serum, tissue, or genome based test is only relevant if it existed and had the ability to show a causal connection between C-8 and testicular cancer. Mr. Vigneron concludes that this would "effectively eliminate[ ] General Causation and consequently would deprive all Leach Class Members of the benefit of the bargain *678 they received under the Contract; namely, that it would be undisputed in their cases that C-8 is, in fact, capable of causing testicular cancer." (PL's Reply at 4.) This Court agrees.
To help clarify, the crux of the issue, as the Court sees it, is whether Dr. Luongo can rebut Dr. Bahnson's opinion based on Dr. Luongo's assessment that it is impossible to establish to a reasonable degree of medical certainty that C-8 was more likely man not the cause of Mr. Vigneron's canceror whether he rebuts the opinion because, in his view, Dr. Bahnson failed to establish to a reasonable degree of medical certainty that C-8 was more likely than not the cause of Mr. Vigneron's cancer. As to that inquiry, only the second is admissible because the first goes to general causation,
2. Reliance on Portions of the Science Panel Reports
[T]he Science Panel found that "there was little or no evidence of increasing risk" in the studied cohort compared with the US population.
....
The claimed association between testis cancer and C8 exposure found by the Science Panel was not strong, was based on a very small number of cases, and has not been replicated.
....
[T]he Science Panel itself recognized that "the high exposure group, where the higher risk was observed, comprises only six cases therefore there remains some uncertainty."
(Luongo Rep. at 7, 8, ECF No. 4639-6.)
As to the last two statements, DuPont posits that "Dr. Luongo is merely rebutting Dr. Bahnson's bolstering of the Science Panel's findings" related to exposure quartiles/relative risks that are referenced in the Science Panel's analysis in reaching its Probable Link Finding related to testicular cancer, and Dr. Bahnson's opinion about the quality of the Science Panel's work. (Def.'s Mem. in Opp. at 12-13.) In this decision, supra , the Court explained that Dr. Bahnson will not be permitted to offer and/or did not offer any of the statements on the quality of the Science Panel's work and the exposure quartiles/relative risks that are referenced in the Science Panel's analysis in reaching its Probable Link Finding related to testicular cancer. Therefore, there is nothing for Dr. Luongo to rebut, and at a minimum these statements are excluded for that reason.
As to the first statement, DuPont contends that "Dr. Luongo is merely pointing out that Dr. Bahnson could not have relied on increased incidence rates for testicular cancer in the Washington Works community because, as the Science Panel stated, they were not increased compared to the U.S. population during the relevant timeframe." (Pl. Mem. in Opp. at 11-12.) Mr. Vigneron is correct that this mere "pointing out" is testimony on the content of the Science Panel's analysis in reaching its Probable Link Finding related to testicular cancer, which has been excluded numerous times because it goes to general causation.
Indeed, that is the problem with all three of these statements and opinions of Dr. Luongo - they are in direct violation of the Leach Settlement Agreement. The Court explained in DMO 1 and DMO 1-A, and numerous times since, that DuPont cannot point "out the 'limitations' in the objective criteria and/or protocols the Science Panel utilized to make its conclusions or by extrapolating from the Science Panel's analysis what the Panel 'did not find' in its Probable Link Finding." (DMO 1 at 9-10; DMO 1-A at 8-11.) Dr. Luongo's statements and opinions specifically highlight what the Science Panel did not find and/or point out nuances and/or limitations *679 in the Science Panel's findings, and are thus subject to exclusion as irrelevant to any fact at issue in this case.
3. Generally Accepted Causes of Testicular Cancer
The following is the last statement Mr, Vigneron asks the Court to exclude:
I disagree with Dr. Bahnson that C8 is a "generally accepted" cause of testis cancer.
(Luongo Rep. at 8, ECF No. 4639-6.)
DuPont contends that this opinion is admissible because Dr. Luongo "is merely rebutting Dr. Bahnson's opinion ... that that C-8 is a 'generally accepted' cause of testicular cancer" that Dr. Bahnson made "[i]n prior expert reports, and during the Freeman trial." (Def.'s Mem. in Opp. at 12.)
However, as Mr. Vigneron correctly states, "Dr. Bahnson did not proffer the opinion in his report [in this case ] that C-8 is generally accepted in the medical community as a cause of testicular cancer [and therefore], Dr. Luongo's opinion that C-8 is not generally accepted in the medical community as a cause of testicular cancer is not a proper rebuttal opinion." (PL's Reply at 5) (emphasis added). The statement is, therefore, irrelevant and inadmissible.
C. Alternative Causes/Risk Factors
In his expert opinion, Dr. Luongo states that "pesticides and sex hormones in cattle feed have been suggested as risk factors for testicular cancer (Ryder 1997)." (Luongo Rep. at 2, ECF No. 4639-6.) Dr. Luongo states that "Dr. Bahnson improperly failed to 'rule-in' Mr. Vigneron's occupational history as part of his differential etiology," noting "Mr. Vigneron reported that he worked for years in a feed store that sold livestock and that he worked on logging wells." Id. at 6.
Mr. Vigneron moves to exclude this testimony because, as Dr. Luongo concedes, logging wells are not "well-established" and/or "generally accepted" in the medical community as risk factors for testicular cancer, are not considered within the medical literature, and Dr. Luongo provides no reasoned explanation as to why these factors should be considered here. Mr. Vigneron cites the following deposition testimony of Dr. Luongo:
Q: But you agree, don't you, that livestock feed is not a well-accepted risk factor for testicular cancer, right?
A: No. It's - it's not. It's not considered that within the medical literature.
....
Q: ... logging wells is not a well-accepted causal factor for testicular cancer -
A: Mm-hmm
Q: ... Because if ... Dr. Bahnson had concluded that, oh, well it was his work on logging wells which likely caused his testicular cancer, your response would be, well, the data are not sufficient to say that working on logging wells causes anyone's testicular cancer. Right?
A. Yeah. I mean, the current state of -- of the signs, there isn't really any compelling data or evidence, yeah to support that claim ....
(Luongo Dep. at 69-72.)
DuPont does not respond to Mr. Vigneron's specific arguments related to logging wells and cattle feed. Instead, DuPont, in a footnote, states that "Plaintiffs challenge to Dr. Luongo's consideration of proposed risk factors for Plaintiff's testicular cancer is an issue of weight to give to the expert opinions, properly left to the jury, not admissibility." (Def.'s Mem. in Opp. at 5, n. 4.) This Court disagrees.
Dr. Luongo's opinion in not based on generally accepted scientific knowledge, scientific literature, and/or professional experience. Thus, the issue is one of admissibility, not weight. Dr. Luongo cannot attack *680 Dr. Bahnson's differential diagnosis with unreliable and speculative evidence.
V.
In accordance with the foregoing, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion Regarding Dr. Robert Bahnson (ECF No. 4657), and GRANTS IN PART AND DENIES AS MOOT IN PART Plaintiffs' Motion Regarding Dr. Luongo (ECF No. 4649).
IT IS SO ORDERED.

DuPont does not challenge Dr. MacIntosh's expert opinion.

In this Opinion and Order, the Court has removed all objections in the quoted deposition testimony.

In a footnote, DuPont states that Dr. Bahnson's testimony in this exchange reflects advocacy on behalf of Mr. Vigneron, which is "antithetical to the impartial role that experts are expected to play in litigation." (Def.'s Reply at 7, n. 4.) DuPont concludes that "[t]his is an additional reason his testimony should be excluded." Id. DuPont, however, fails to provide any case law to support its position, and this Court finds none.

The National Cancer Institute publishes these statistics titled Surveillance, Epidemiology, and End Results Program, or "SEER." seer.cancer.gov/statistics/types.html.